Stephen A. MAHONEY, III, and Mary Ann Mahoney, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 86–1131.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 14, 1986.

Decided Jan. 14, 1987.

Fred T. Goldberg, Chief Counsel, Internal Revenue Service, Washington, D.C., W. Jere Blackshere, Asst. Dist. Counsel, Dallas, Tex., Michael L. Paup, Dept. of Justice, Tax Div., Washington, D.C., Roger M. Olsen, Richard Farber, Kenneth L. Greene (argued), for respondent-appellee.

Edward G. Lavery (argued), Hercules and Lavery, Dallas, Tex., Larry K. Hercules, for petitioners-appellants.

Before WELLFORD and GUY, Circuit Judges; and PECK, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

This is a complicated case involving gold and platinum straddles on the London market. Although we are dealing with only one appellant, the case was actually a consolidated trial at the Tax Court level, involving several different persons similarly situated.

■ The issue in the case is the deductibility of the tax losses sustained by all the taxpayers who entered into these straddles. Such transactions, in order to be deductible under the Internal Revenue Code, have to have been transactions "entered into for

profit."[1] Although the Code phrase is a term of art that has not been interpreted the same by all courts, it is clear that the transaction cannot be a complete sham. If it is a sham, then such niceties as whether it was "primarily" for profit, or whether the test is an objective or subjective one are simply not involved. Regardless of the definition, the transaction must be bona fide.

Here, the Tax Court in a lengthy and well-reasoned opinion decided the transactions were a sham, thus making it unnecessary to directly reach the "entered for profit issue." The Tax Court looked to the whole scenario and concluded that the taxpayers had really just paid a fee to buy fictitiously generated tax losses which were not only tailored to how much loss they needed to offset income, but also were tailored to whether they needed offsets for ordinary income or capital gains.

Although there are a whole host of specific incidents and other indicia pointing to a sham, the most damaging evidence is really the overview of the entire course of dealings. On the London end there is a conspicuous lack of concern over such things as posting or adequacy of margins, the lack of margin calls, the starting of trading in an account without formal authorization, and the proper separation of accounts. There are also a conspicuous lack of records and a plethora of poorly kept records which cannot be sorted out.

On the American end there was no concern shown for risk, no attention paid to margin, no concern for account balances, and no concern for allegedly grievous errors in London account keeping. There

was also complete discretion accorded to London which, although not illegal or even uncommon, is nonetheless curious here when one considers the risk of commodities trading and the lack of experience of the taxpayer traders.

There are also any number of occurrences just too convenient to be explained away by the long arm of coincidence: the relationship of the margins to the amount of loss desired by each taxpayer, suggesting that the margin amounts were actually fees; the close correlation between the "advertised" losses to be expected and what each taxpayer paid for and received; the handling of the account of the one taxpayer who needed capital gains rather than regular income offsets differently from all the others; the "zeroing out" of all margin accounts; and the striking similarity between what happened in all 160 cases investigated by the IRS involving the same London company.

Much of the resolution of this case involved credibility determinations and factual findings. These, of course, cannot be disturbed unless clearly erroneous. On the state of the record presented, we cannot say such findings were clearly erroneous. On the contrary, they appear to us to be clearly correct.

We adopt the thorough decision of Judge Korner of the Tax Court as the decision of this court and AFFIRM.[2]

1. See I.R.C. § 165(c); Tax Reform Act of 1984, Pub.L. No. 98–369, § 108, 98 Stat. 494; and *Smith v. CIR*, 78 T.C. 350, 363 (1982).

2. We note the Eleventh Circuit has also sustained the Tax Court in the companion case of *Wooldridge v. Commissioner of Internal Revenue*, 800 F.2d 266 (11th Cir.1986). We also note with approval the reasons stated in approving a tax deficiency in a similar commodity straddle situation in *Glass v. Commissioner*, 87 T.C. 68 (Nov. 17, 1986). The approach in this latter case is somewhat different in that it focused on the issue of whether the transactions in question,

assuming they actually took place and were conducted in good faith in a legitimate market, had any real function apart from obtaining tax deductions. The Tax Court in *Glass* held that if the taxpayer involved had no genuine business or profit motive for the straddle transactions, the losses claimed were not deductible. This approach is a sound one, and it bolsters the conclusions the Tax Court reached in the instant case. The taxpayer here, as in *Glass,* has demonstrated no real motive for the claimed straddle transactions except to generate loss deductions for tax purposes.