EDWARD AND PHYLLIS KATZ, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 6602-83.          Filed June 15, 1988.

*Leonard A. Messinger* and *Mary J. Fahey,* for the
petitioners.
*Jack H. Klinghoffer, Jane B. Wilson,* and *Stephen Ianello,*
for the respondent.

## OPINION

WELLS, *Judge:* Respondent determined deficiencies in
petitioners' Federal income tax for 1977 and 1978 in the
amounts of $90,512 and $3,158, respectively. Respondent
also determined that petitioner Edward Katz was liable for
additions to tax pursuant to section 6653(b)[1] for 1977 and
1978 in the amounts of $76,844 and $1,579, respectively.
The issues for decision are (1) whether petitioners' reported
gains and losses from commodity spread transactions
should be disallowed, and, if so, (2) whether petitioner
Edward Katz is liable for additions to tax for fraud
pursuant to section 6653(b).

---

[1]Unless otherwise indicated, all section references (except to sec. 108 of the Deficit
Reduction Act of 1984, as amended by the Tax Reform Act of 1986) are to the Internal
Revenue Code as amended and in effect during the taxable years at issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioners resided in Tenafly, New Jersey, when they filed their petition.

During 1977 and 1978, Edward Katz (hereinafter singly referred to as petitioner) was president of MMR Leasing Corp., a truck leasing business in which his brothers also were involved.

In 1974, petitioner purchased a seat on and was elected to membership in the New York Mercantile Exchange (NYMEX). There are two types of members of the NYMEX— floor traders and floor brokers. Both floor traders and floor brokers are allowed on the trading floor and receive reduced charges for their trades on the NYMEX. The main distinguishing characteristic between the two types of members is that floor brokers are qualified to execute trades for third parties; floor traders may trade only for their own accounts. Floor brokers are required to be registered with the Commodity Futures Trading Commission (CFTC), the regulatory body having authority over the NYMEX. Petitioner was a floor trader, never a floor broker, and he was not registered with the CFTC.

In 1971, the NYMEX introduced trading in futures contracts in silver coins. In 1977, trading began on the NYMEX in 400-ounce gold futures contracts. During the years in issue, petitioner traded futures contracts for silver coins and 400-ounce gold.[2] Petitioner held those futures contracts in a form known on the NYMEX as "spread positions." (Certain other commodities markets describe such positions as straddles.) "Spread trading" on the NYMEX refers to the simultaneous purchase and sale of equal, but offsetting, positions (referred to as legs) in different future delivery months of the same commodity, for the same accounts by the same opposite brokers, and at a price differential that is determined by open and competitive outcry.

---

[2]Petitioner also traded in futures contracts for potatoes during the years in issue, but respondent does not challenge petitioner's potato trades except to the extent of asserting that petitioner failed to report a $425 gain from potato transactions in 1978. Petitioner has not argued that respondent's determination with respect to that $425 gain was incorrect, and we take that as a concession as to that amount.

Spread trades normally are executed between brokers on the basis of a price differential rather than on the basis of prices for the individual contracts making up each leg. The brokers assign prices to the particular contract after the execution of the trade by agreeing on the prices of each leg of the spread. The NYMEX rules require that spreads executed by differential must be in line with prevailing spread differentials and must be within the trading range of the day for the same contracts at the time of execution. For example, if a broker intends to execute a March/December spread at 11 a.m. and the prices of executed trades in the March future ranged between $175 and $180 from the opening of trading to 11 a.m., the broker must select a price for the March leg between $175 and $180. The prices selected also must be within the price differential between the March and December futures that exists at the time the spread was executed. NYMEX rules require that the seller of each leg of a spread trade report the fact that the trade was executed as part of a spread trade, the differential at which the spread was executed, and the prices of each leg of the spread.

Spread positions also may be achieved by "legging in" rather than by actual spread trading. Legging in is accomplished by executing one leg of a spread at a different time than the opposite leg. Each leg is executed at a specific price, instead of by price differentials, and need not be opposite the same broker and account as was the opposite leg. The second leg of the spread may be executed within minutes after the initial leg is executed, or the spread may not be completed until some time much later. NYMEX rules do not require a spread position completed in that manner to be reported as a spread trade.[3]

Petitioner, as a floor trader member of the NYMEX, could execute trades for his own account; however, he in fact did not. Stanley Buckwalter, a registered floor broker, executed for petitioner all of the trades in silver coin futures and 400-ounce gold futures at issue in the instant case. All of

---

[3]A more detailed discussion of commodity futures trading may be found in *Perlin v. Commissioner*, 86 T.C. 388, 391-394 (1986); *Miller v. Commissioner*, 84 T.C. 827, 828-830 (1985), revd. 836 F.2d 1274 (10th Cir. 1988); *Smith v. Commissioner*, 78 T.C. 350, 354-357 (1982); *DeMartino v. Commissioner*, T.C. Memo. 1986-263; and *Landreth v. Commissioner*, T.C. Memo. 1985-413, affd. 845 F.2d 828 (9th Cir. 1988).

those gold and silver trades were cleared through and carried in an account handled by Rosenberg Commodities, Inc. (Rosenberg Commodities).

The 21 gold and silver transactions at issue were executed as 10 sets of trades and were reflected in petitioner's account as follows:

| Number and type of contracts | Date bought | Date sold | Price spread differential (sold/bought) | Gain/ (loss) [4] | Commission | Net gain/ (loss) |
|---|---|---|---|---|---|---|
| Silver coins | | | | | | |
| 24 Jan78 | 7/25/77 | 8/16/77 | ($2.67) | ($64,080) | $420 | ($64,500) |
| 24 Apr78 | 10/18/77 | [5]7/25/77 | (1.06) | (25,440) | 420 | (25,860) |
| 24 Jul78 | 8/16/77 | 1/03/78 | 3.44 | 82,560 | 420 | 82,140 |
| 24 Oct78 | 1/03/78 | 10/18/77 | 0.29 | 6,960 | 420 | 6,540 |
| Total for the first series of trades | | | | 0 | 1,680 | (1,680) |
| | | | | | | |
| 400-oz. Gold | | | | | | |
| 20 Sep78 | 11/16/77 | 11/22/77 | (4.95) | (39,600) | 1,200 | (40,800) |
| 20 Dec78 | 1/03/78 | 11/16/77 | (7.50) | (60,000) | 1,200 | (61,200) |
| 20 Jun78 | 11/22/77 | 1/03/78 | 12.45 | 99,600 | 1,200 | 98,400 |
| Total for the second series of trades | | | | 0 | 3,600 | (3,600) |
| | | | | | | |
| 40 Mar79 | 10/31/78 | 9/29/78 | (20.00) | (320,000) | 3,200 | (323,200) |
| 20 Sep79 [6] | 9/29/78 | 10/31/78 | 20.00 | 160,000 | 1,600 | 158,400 |
| 20 Sep79 | 9/29/78 | 1/05/79 | 3.10 | 24,800 | [7] | --- |
| 20 Mar80 | 1/05/79 | 10/31/78 | 16.90 | 135,200 | --- | --- |
| Total for the third series of trades | | | | 0 | | |

As shown in the fifth column of the above chart, in each of the three series of trades, petitioner's net gains and losses, before commissions, exactly offset each other. Hereinafter, the trades transacted from July 1977 through January 1978 sometimes are referred to as the 1977 spreads, and the trades transacted from September 1978 through January 1979 sometimes are referred to as the 1978 spreads.

[4]Gain or loss is computed as follows:

Silver: price spread × $1000 per spread point × # of contracts.

Gold: price spread × 400 ounces per contract × # of contracts.

[5]On those contracts for which the sell date is earlier than the buy date. petitioner might be said to have been "short" on those contracts until he purchased an identical contract to offset that short position. Similarly, petitioner might be said to have been "long" on those contracts purchased before sold. Petitioner treated the spread transactions as being completed when a contract was both purchased and sold. In accordance with his spread (or straddle) strategy, when petitioner purchased contracts, he also sold on the same date the same number of contracts for the same commodity.

[6]The September 1979 gold contracts were bought in a single 40-contract transaction and were sold in two 20-contract transactions.

[7]The amounts of the commissions and net gains on the spreads closed in 1979 are not in the record.

On his 1977 and 1978 tax returns, petitioner reported the results of the 1977 and 1978 spreads as short-term capital gains and losses, as follows:

| Commodity | Year reported | Acquired | Sold | Gain/(Loss) |
|---|---|---|---|---|
| Silver coins | 1977 | 7/77 | 8/77 | ($64,500) |
| Silver coins | 1977 | 7/77 | 10/77 | (25,860) |
| Gold | 1977 | 11/77 | 11/77 | (40,800) |
| Gold | 1978 | 10/78 | 9/78 | (323,200) |
| Gold | 1978 | 9/78 | 10/78 | [8]158,478 |

In the notice of deficiency, respondent determined that the foregoing losses were disallowed and that petitioner's capital gains for 1978 should be decreased in the amount of the $158,478 reported gain on gold.

Petitioner's tax returns did not reflect the two silver transactions and the two gold transactions completed on January 3, 1978. Those unreported transactions were reflected in petitioner's account as showing, after commissions, a loss of $61,200 (gold) and gains of $6,540 (silver), $82,140 (silver), and $98,400 (gold). The notice of deficiency did not address the transactions completed on January 3, 1978, apparently on the same basis upon which the reported gains and losses were disallowed, i.e., gains and losses from the spread transactions should not be recognized and included in petitioner's taxable income.

On the days of petitioner's trades, petitioner's trade volume compared to the total number of contracts traded on the NYMEX was as follows:

| Date | Petitioner's volume | Total market volume | Date | Petitioner's volume | Total market volume |
|---|---|---|---|---|---|
| 07/25/77 Silver | 48 | 75 | 11/22/77 Gold | 40 | 80 |
| 08/16/77 Silver | 48 | 122 | 01/03/78 Gold | 40 | 648 |
| 10/18/77 Silver | 48 | 248 | 09/29/78 Gold | 80 | 99 |
| 01/03/77 Silver | 48 | 576 | 10/31/78 Gold | 80 | 80 |
| 11/16/77 Gold | 40 | 238 | 01/05/79 Gold | 40 | 61 |

[8]This amount differs by $78 from the net results of the September 1979 gold contracts bought on Sept. 29 and sold on Oct. 31. Petitioner's account statements from Rosenberg Commodities reflect a $77.50 credit for "Spread Comm. Adj." on Nov. 1, 1978, and he apparently included that adjustment on his 1978 tax return as part of the reported gain on the Oct. 31 gold sale. Petitioner's account statements indicate, however, that the commission adjustment was attributable to an overcharge on a potato trade. We therefore find that the refund of the commission overcharge is properly includable in petitioner's 1978 income as a decrease in the reported expenses of his potato trades, notwithstanding our holding on the gold and silver trades. Accordingly, we find that the gold gain in issue herein is $158,400, not $158,478.

On 12 of petitioner's transactions (six spreads) an offsetting position in the same commodity for a different delivery month was executed at the same time. Two sets (four trades) of the other transactions occurred within 1 minute of the offsetting transaction, and the seven remaining transactions occurred within 7 minutes of the offsetting transaction. In all but one of the spreads, the purchase transaction was made opposite the same broker as the offsetting sale transaction, yet only one of the sets of transactions was reported to the NYMEX as a spread trade.

On 5 of the 10 days on which petitioner traded, his transactions made up at least one half of the total volume of the NYMEX. On 6 of the 10 trade days, his trades in lots of 20, 24, or 40 contracts were the only trades of more than 10 contracts of the commodity on that day. In general, then, petitioner's 1977 and 1978 spreads were large multicontract lots executed in a low-volume market. In addition, even though the spread transactions were large lots in a low-volume market, none was executed as a split fill (a multicontract purchase or sale executed in segments of the total purchase or sale quantity, at different times, and often, but not necessarily, at different prices and with different opposite brokers).

Petitioner's broker, Mr. Buckwalter, was charged by the CFTC and ultimately was found to have violated 7 U.S.C. sec. 6c(a) and 17 C.F.R. sec. 1.38 by executing trades that were wash sales and accommodation trades and by causing non-bona fide prices to be reported to the NYMEX. See *In the Matter of Stanley Buckwalter, et al.*, CFTC docket No. 80-28, Comm. Fut. L. Rep. (CCH) [1984-1986 Transfer Binder] par. 22,782, at 31,268 (Sept. 27, 1985). Those findings against Mr. Buckwalter were based, in large part, on petitioner's 1977 and 1978 spreads.[9] Similar findings were made with respect to several of the opposite brokers on petitioner's 1977 and 1978 spreads; however, no charges ever were brought against petitioner by the CFTC.

---

[9] Mr. Buckwalter also was found to have violated other provisions of the Commodity Exchange Act (tit. 7, U.S.C.) and the CFTC regulations by altering records and aiding and abetting other NYMEX members in their failure to maintain true records of customer accounts. Such findings were based on Mr. Buckwalter's use of a fictitious name (the maiden name of his then deceased wife) to execute trades and exercise trading control over accounts opened with various NYMEX members, activities unrelated to petitioner's spread trades.

The rules of the NYMEX, as well as the provisions of the Commodity Exchange Act, prohibit wash trading, accommodation trading, and causing prices to be reported which are not true and bona fide.[10] See 7 U.S.C. sec. 6c(a) (1976).

OPINION

The first issue for decision is whether petitioner's spread losses should be disallowed. Petitioner's primary argument is that the disposition of this case is governed by section 108 of the Deficit Reduction Act of 1984, as amended by the Tax Reform Act of 1986.[11] Specifically, petitioner asserts that he is a commodities dealer, as contemplated in section 108(b), and therefore is "entitled to the per se rule of section 108." Under that per se rule, any loss incurred by a commodities dealer in the trading of commodities is allowed for the taxable year of disposition. See sec. 108(a) and (b).

The parties disagree about whether petitioner was a commodities dealer for purposes of section 108;[12] however, we shall assume, without deciding, that petitioner was a commodities dealer when the 1977 and 1978 spreads were

---

[10]CFTC regulations provide a limited exception whereby commodity transactions need not be "executed openly and competitively by open outcry of posting of bids and offers" if the contract market has written rules which provide for such an exception and which have been approved by the CFTC. See 17 C.F.R. sec. 1.38(a) (1987). The CFTC had not approved any exception from the general rule whereby trades in 400-oz. gold or silver coin futures were allowed to be executed noncompetitively on the NYMEX. In fact, on account of the NYMEX' deficiencies in monitoring and enforcing its own trading rules with respect to silver coin and 400-oz. gold futures during the period of the spreads at issue, the CFTC fined the NYMEX $200,000 and threatened to close the NYMEX. In order to settle the charges brought by the CFTC, the NYMEX agreed to decertify (revoke its designation as a market for) silver coin and 400-oz. gold futures.

[11]The parties do not dispute that the 1977 and 1978 spreads constitute straddle transactions, as contemplated in sec. 108. The provisions of sec. 108, as in effect both before and after the 1986 amendment, are discussed more fully in *Glass v. Commissioner,* 87 T.C. 1087, 1164-1169 (1986). See also *Cook v. Commissioner,* 90 T.C. 975 (1988).

[12]The parties' disagreement centers on the definition of a "commodities dealer." Petitioner asserts that the Conference report accompanying the Tax Reform Act of 1986 provides that any individual who "owns a seat on a commodities exchange" will be treated as a commodities dealer, and that petitioner plainly meets that definition. See H. Rept. 99-841 (Conf.) (1986), 1986-3 C.B. (Vol. 4) at 845. Respondent, on the other hand, asserts that the language of the statute, sec. 108(f)(1), plainly provides that a "commodities dealer" is a person described in sec. 1402(i)(2)(B), and that petitioner does not meet that definition because he was never registered with any domestic board of trade, as required in sec. 1402(i)(2)(B). By virtue of our holdings below, we need not determine whether petitioner actually was a commodities dealer for purposes of sec. 108.

transacted.[13] Even if petitioner were a commodities dealer, however, the per se rule of section 108(b) is not available for any of his transactions that were fictitious, prearranged, or *otherwise in violation of the rules of the exchange in which he was a member. Cook v. Commissioner,* 90 T.C. 975, 986 (1988). See also H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 911. Respondent asserts that the 1977 and 1978 spreads were prearranged or otherwise in violation of NYMEX rules, so that the per se rule of section 108(b) is not available to sanction petitioner's spreads. As such, respondent posits that petitioner must meet the requirements of section 108(a) in order for the losses on the spreads to be allowed.

Section 108(a) provides that in the case of straddle transactions, such as the spreads in issue, deductions are allowed for incurred losses if the straddle transactions were entered into for profit. See *Glass v. Commissioner,* 87 T.C. 1087, 1175 (1986). Before we may inquire as to whether straddle transactions were entered into with a profit motive, however, we first must determine that the spread transactions themselves were bona fide, i.e., not shams. *Sochin v. Commissioner,* 843 F.2d 351, 353 n. 6 (9th Cir. 1988), affg. *Brown v. Commissioner,* 85 T.C. 968, 998 (1985); *Forseth v. Commissioner,* 85 T.C. 127, 166 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. *Enrici v. Commissioner,* 813 F.2d 293, 295 n. 1 (9th Cir. 1987), affd. sub nom. *Mahoney v. Commissioner,* 808 F.2d 1219, 1220 (6th Cir. 1987), affd. without published opinion sub nom. *Bramblett v. Commissioner,* 810 F.2d 197 (5th Cir. 1987), affd. without published opinion sub nom. *Wooldridge v. Commissioner,* 800 F.2d 266 (11th Cir. 1986). See also sec. 1.165-1(b), Income Tax Regs. As we noted when presented with similar facts in another case, "Alleged transactions involving commodity futures contracts which are not in fact bona fide will not be recognized for Federal tax purposes." See *DeMartino v. Commissioner,* T.C. Memo. 1986-263, and cases cited therein. Respondent asserts that the 1977 and 1978 spreads were "rigged, prearranged, manipulative, or fictitious," i.e.,

---

[13]There is also evidence which indicates that petitioner may have sold his seat on the NYMEX in August or September 1978, before positions on any of the 1978 spreads were taken.

not bona fide, and that the spreads therefore are devoid of the substance necessary for recognition for tax purposes.

It is well established that income tax deductions are a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer. *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 593 (1943). See also Rule 142(a). Petitioner has alternative burdens of proof in the instant case. In order for the per se rule of section 108(b) to be available with respect to the spreads at issue, petitioner must prove that the provisions of section 108(b) apply to those spreads. If petitioner fails to show his entitlement to section 108(b) treatment, he must prove that he entered into the straddle transactions with the requisite profit motive in order for the losses on the spreads to be allowed under section 108(a). As we noted above, transactions must be bona fide before losses are allowable under section 108(a); thus, petitioner must show that the 1977 and 1978 spreads were bona fide. In short, if section 108(b) does not apply to petitioner's spread transactions, a failure to prove either the bona fides of the spreads or the requisite profit motive will cause those spreads to be disregarded for tax purposes.

The facts surrounding trading on the NYMEX in gold and silver coin futures strike us as being quite similar to those before the Court in *United States v. Winograd,* 656 F.2d 279 (7th Cir. 1981). In *Winograd* the taxpayers executed trades on a legitimate market, but those trades were prearranged, not executed through bona fide transactions in the competitive market in the usual manner of open outcry. The Seventh Circuit stated that "appellants *appeared* to be utilizing the organized market, but were in fact *creating* a market for their transactions at the prices they established for ulterior purposes. Such prearranged trades are not bona fide transactions supporting loss deductions." (Emphasis in original.) 656 F.2d at 283. That statement by the Seventh Circuit would apply as well to the NYMEX gold and silver brokers during 1977 and 1978, and we also find that the transactions at issue in the instant case were not bona fide transactions. The reasons for our conclusion follow.

Respondent's expert witness in the instant case, Edward O'Brien, also testified as an expert witness in the case in

which the CFTC charged Mr. Buckwalter and other NYMEX brokers with the violation, inter alia, of section 4c(a) of the Commodity Exchange Act (7 U.S.C. sec. 6c(a) (1976)[14]). Mr. Buckwalter ultimately was found to have violated that provision of law, as well as CFTC regulation 1.38 (17 C.F.R. sec. 1.38 (1977)), by executing wash sales and accommodation trades and causing the reporting of prices which were not true and bona fide. See *In the Matter of Stanley Buckwalter, et. al., supra* at 31,268. Such findings were based, in large part, on petitioner's 1977 and 1978 spreads as analyzed by Mr. O'Brien in an expert witness report. In the instant case, Mr. O'Brien submitted an expert witness report substantially identical to the one he submitted in the *Buckwalter* case.

Although the findings in *Buckwalter* are not determinative of the issues in the instant case, the analysis in that case was based on the same transactions. The analysis in *Buckwalter* thus is helpful in setting the framework for our analysis in the instant case. First, however, we must ascertain the meaning of the terms "accommodation trades" and "wash sales" in the context of commodities futures law. For purposes of commodities law, "accommodation trading" is defined as wash trading entered into by a trader, usually to assist another with illegal trades, and "wash trading" is defined as entering into, or purporting to enter into, transactions to give the appearance that purchases or sales have been made, usually without a change in the trader's market position. *Sundheimer v. Commodity Futures Trading Commission*, 688 F.2d 150, 152 (2d Cir. 1982) (quoting from

---

[14]As in effect during the years in issue, that section provided:

Sec. 6c. Wash sales; cross trades; fictitious sales; privileges; offers; puts; calls; guaranties

(a) It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity, which is or may be used for (1) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (2) determining the price basis for any such transaction in interstate commerce in such commodity, or (3) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(A) if such transaction is, is of the character of, or is commonly known to the trade as, a "wash sale," "cross trade," or "accommodation trade," or is a fictitious sale;

(B) if such transaction involves any commodity specifically set forth in section 2 of this title, prior to October 23, 1974, and if such transaction is of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guaranty," or "decline guaranty," or

(C) if such transaction is used to cause any price to be reported, registered, or recorded which is not a true and bona fide price.

Committee on Agriculture, Nutrition, and Forestry, 95th Cong. 2d Sess., Futures Trading Act of 1978, Glossary of Terms Used in Commodity Futures Trading (Comm. Print 1979)). The essential and identifying characteristic of a wash sale seems to be the intent not to make a genuine, bona fide trading transaction. *Sundheimer v. CFTC, supra* (quoting *CFTC v. Savage,* 611 F.2d 270, 284 (9th Cir. 1979), and *In re Goldwurm,* 7 Agric. Dec. 265, 274 (1948)[15]). It is that intent, the absence of good faith, arm's-length trading, and the undisclosed prearrangement for losses and gains, that demonstrates the accommodation nature of transactions. *Sundheimer v. CFTC, supra.*

Petitioner has introduced no evidence whatsoever to indicate that his 1977 and 1978 spread transactions would not fit under the foregoing descriptions of wash trades and accommodation trades. Indeed, the fact that petitioner exactly broke even, exclusive of commissions, on each of his three series of spreads supports a conclusion that the trades were rigged or prearranged and not bona fide, competitive, market trades. That each series of spreads *exactly* broke even seems to us too convenient to be explained away by the long arm of coincidence. See *Mahoney v. Commissioner,* 808 F.2d at 1220. The thinness of the NYMEX gold and silver futures markets apparently allowed the group of brokers charged and sanctioned by the CFTC to prearrange the transactions without substantial threat of market volatility beyond their control. As was noted in another case describing the NYMEX silver coin market as a "thin, infrequently traded market with low daily volume," "the possibilities are enhanced that such market prices that are reported may be because of discretionary determination by exchange officials or improper influence by market participants rather than a reflection of supply and demand, technical trading signals, world and national news reports or independently occurring events." See *Gittemeier v. Smith Barney, Harris Upham & Co.,* CFTC docket No. R 80-1255-81-182, Comm. Fut. L. Rep. (CCH) [1982-1984 Trans-

---

[15]*Goldwurm* involved "offsetting transactions to create artificial tax losses." See *Stoller v. CFTC,* 834 F.2d 262, 266 (2d Cir. 1987), wherein it also was stated that wash sales are transactions which are "virtually risk-free, often prearranged, and intentionally designed to mislead."

fer Binder] par. 21,929, at 28,006 (Nov. 30, 1983), and articles cited therein.

The absence of split fills in the execution of petitioner's spreads also indicates a lack of competitive trades. Mr. O'Brien's expert report asserted that it was highly unlikely that these comparatively large multicontract lots could be competitively traded at a single price and time of execution on futures markets which otherwise had very limited volume. As was similarly noted in *Buckwalter*, it is an unexplained, "seemingly odd coincidence that so frequently when a large order appeared on the floor another trader appeared willing to take the entire order." See *In the Matter of Stanley Buckwalter, et. al., supra* at 31,250. Petitioner has not advanced sufficient evidence to persuade us that the spreads in issue were executed in accordance with all the rules of the NYMEX. In fact, the exact equality of all gains and losses, the thinness of the silver coin and 400-ounce gold markets, and the absence of split fills, when taken together, indicate that the 1977 and 1978 spreads were wash sales or accommodation trades in violation of the rules of the NYMEX. We accordingly find that the per se rule of section 108(b) is not available with respect to petitioner's 1977 and 1978 spread transactions. *Cook v. Commissioner, supra.*

The wash sale or accommodation nature of the spread trades also indicates that petitioner's 1977 and 1978 spreads were not bona fide, i.e., that they were risk-free transactions devoid of any true economic substance. Petitioner has not advanced sufficient evidence for us to conclude that the spread trades were bona fide. Petitioner testified that he knew nothing about any prearrangement of trades for his account, and that his instructions to Mr. Buckwalter were to close out the spread positions as soon as possible after yearend so as to break even or yield a profit. Even if petitioner truly did not know his trades were executed noncompetitively and were not bona fide, however, his ignorance does not change the true nature of the trades. Where transactions in fact are devoid of economic substance, they are economic shams and are not to be recognized for tax purposes. See *Lynch v. Commissioner,*

273 F.2d 867, 872 (2d Cir. 1959); *Cherin v. Commissioner,* 89 T.C. 986, 994 (1987).[16]

In conclusion, based upon our careful review of the entire record, we find that petitioner has failed to prove that his 1977 and 1978 spreads were bona fide trades. We therefore uphold respondent's determinations with respect to the reported losses and gains on the 1977 and 1978 spreads.[17]

In his brief, petitioner offers an alternative argument if we should hold that his 1977 and 1978 gold and silver transactions are to be disregarded. Specifically, petitioner argues that his 1977 taxable income should be decreased by the amount of short-term capital gain reported by him as being attributable to dispositions of silver coin contracts in January 1977.[18] (Hereinafter we shall refer to those January 1977 transactions as the 1976 spreads.) Petitioner has the burden to prove that the income from the 1976 spreads, which he reported on his 1977 tax return, is not properly includable in income. Rule 142(a).

Petitioner's argument apparently is based on the reasoning that the disallowance of the 1977 and 1978 spreads should cause the nonrecognition of all other transactions on the NYMEX in gold and silver coin futures. Petitioner's reasoning, however, overlooks several vital facts with regard to his 1976 spreads: (1) Those transactions were held in an account with Chartered New England Corp., not Rosenberg Commodities, and there is no evidence whatsoever that the floor broker for those 1976 spreads was Mr. Buckwalter or any other broker sanctioned by the CFTC; (2) none of the prearranged transactions at issue in the *Buckwalter* case took place before July 5, 1977, i.e., several months after petitioner's 1976 spreads were completed; and (3) the record contains no evidence whatsoever to indicate that petitioner's 1976 spreads were wash trades, accommo-

---

[16]See also *DeMartino v. Commissioner,* T.C. Memo. 1986-263, n. 19, and cases cited in that footnote.

[17]On account of our finding that the spreads were not bona fide economic transactions, we need not reach the issue of petitioner's profit motive. See *Enrici v. Commissioner,* 813 F.2d at 295 note 1; *Brown v. Commissioner,* 85 T.C. at 998, 1000; *Forseth v. Commissioner,* 85 T.C. at 166 n. 43.

[18]Apparently, petitioner is asserting that the amount of the contested income is $222,985— the total reported on his 1977 tax return as gain from silver contracts sold in January 1977. Brokerage statements which are in evidence address only approximately $174,500 of the gain, and the record is devoid of any evidence with respect to the remainder of the gain. Petitioner's brief does not offer any suggested amount by which his taxable income should be reduced.

dation trades, or any other sorts of trades which were not bona fide, competitive, market trades. As such, petitioner clearly has failed to show that the income from the 1976 spreads reported on his 1977 tax return is not properly includable in taxable income. Rule 142(a). We therefore find that petitioner is not entitled to any reduction in his 1977 taxable income on account of his 1976 spreads.[19]

We next turn to the final issue—whether petitioner is liable for the addition to tax for fraud pursuant to section 6653(b).[20] Respondent has the burden to prove, by clear and convincing evidence, that some part of the underpayment for each year is attributable to fraud. Sec. 7454(a); Rule 142(b). That burden is met by a showing that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes known or believed to be owing. *Stoltzfus v. United States,* 398 F.2d 1002, 1004 (3d Cir. 1968); *Webb v. Commissioner,* 394 F.2d 366, 377-378 (5th Cir. 1968); *Rowlee v. Commissioner,* 80 T.C. 1111, 1123 (1983).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Gajewski v. Commissioner,* 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud never will be presumed (*Beaver v. Commissioner,* 55 T.C. 85, 92 (1970)); however, it may be proved by circumstantial evidence because direct proof of a taxpayer's intent rarely is available. *Rowlee v. Commissioner,* 80 T.C. at 1123; *Gajewski v. Commissioner,* 67 T.C. at 200. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Stone v. Commissioner,* 56 T.C. 213, 224 (1971); *Otsuki v. Commissioner,* 53 T.C. 96, 106 (1969).

At the outset, we note an absence of the usual badges of fraud. Petitioner did not consistently underreport his income (*Holland v. United States,* 348 U.S. 121, 137 (1954); *Otsuki v. Commissioner,* 53 T.C. at 107)); at most, he deferred the reporting of part of his income by 1 year by

---

[19]We note that sec. 108 does not provide for any nonrecognition in the case of gains from straddle positions. In that vein, sec. 108 only allows recognition of losses from straddle positions to the extent necessary to reflect the net gain or loss from all positions in the straddle. Sec. 108(c). Petitioner has not suggested that any losses with respect to the 1976 spreads have been disallowed or that his net gain or loss from all positions in the 1976 spreads has not been reflected in his taxable income.

[20]Respondent made no determination of fraud with respect to Phyllis Katz.

the use of commodities futures spreads and failed to report on one return the results of five spread transactions completed on January 3, 1978—four gains and one loss netting a gain of $126,305. Petitioner's failure to report the January 3, 1978, transactions is not sufficient to establish fraud (*Merritt v. Commissioner,* 301 F.2d 484, 487 (5th Cir. 1962)); indeed, it appears to us that his failure to include those transactions on his 1978 return was merely an oversight, albeit a negligent one. We have seen no indication that petitioner's records of his spreads were inadequate, that petitioner failed to file tax returns, that petitioner has concealed his assets, or that petitioner has not adequately cooperated with tax authorities. See *Bradford v. Commissioner,* 796 F.2d 303, 307 (9th Cir. 1986). Petitioner also has not filed any false documents. See *Stephenson v. Commissioner,* 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). At most, the reporting of the spreads on his tax returns was an assertion that he had a right to the reported gains and losses from the spread transactions.

Respondent bases his allegation of fraud on his assertions that petitioner had actual knowledge that the 1977 and 1978 spreads were prearranged and without economic substance, and that petitioner thus took deductions for transactions which he knew were lacking in economic substance. Respondent, however, has failed to prove clearly and convincingly that petitioner actually knew of the prearranged and noncompetitive nature of the 1977 and 1978 trades. At best, the record as a whole provides only a suspicion that petitioner might have known that Mr. Buckwalter and the other sanctioned brokers were fixing or prearranging the contracts. This Court, however, will not sustain a finding of fraud based upon circumstances which at the most create only suspicion. *Green v. Commissioner,* 66 T.C. 538, 550 (1976); *Ross Glove Co. v. Commissioner,* 60 T.C. 569, 608 (1973). The standard of proof for fraud requires clear and convincing evidence. We therefore hold that respondent has failed to prove that petitioner is liable for additions to tax for fraud.

To reflect the foregoing,

> *Decision will be entered for respondent, except as to the addition to tax pursuant to section 6653(b).*

