GEORGE D. F. LAMBORN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lamborn v. Commissioner
Docket No. 41978-84
United States Tax Court
T.C. Memo 1994-515; 1994 Tax Ct. Memo LEXIS 523; 68 T.C.M. (CCH) 950; October 17, 1994, Filed *523 An order will be issued denying petitioner's motion. For petitioner: F. Whitten Peters and Irwin S. Meyer. For respondent: Wilton A. Baker. PANUTHOS
PANUTHOS
MEMORANDUM OPINION PANUTHOS, Chief Special Trial Judge: This case was assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] This matter comes before the Court on petitioner's Motion to Enforce Settlement Agreement. At the time the petition was filed, petitioner resided in New York, New York. Respondent determined a deficiency in petitioner's 1980 Federal income tax in the amount of $ 166,151, and additions to tax under sections 6653(a) and 6651(a) in the amounts of $ 10,670.35 and $ 23,493.45, respectively. On October 15, 1985, the parties filed a Stipulation of Settled Issues, *524 which resolved all issues except for issues concerning petitioner's participation in the Futures Trading, Inc. (FTI)/Merit Securities, Inc. (Merit) Treasury Bill option project. In four consolidated test cases, Seykota v. Commissioner, T.C. Memo. 1991-234, supplemented by T.C. Memo. 1991-541, we addressed issues concerning the various FTI/Merit projects. Petitioner was not a party to those cases and did not execute a written "piggyback" agreement. Background
In 1980 and 1981, petitioner was an investor in the FTI Arbitrage and Carry Program. As part of the program, petitioner participated in what was known as the Merit Securities project. The project involved purchases and sales of substantially offsetting options to purchase ("call" options) Treasury Bills (T-Bills) and options to sell ("put" options) T-Bills to establish what is called a "spread" position. [2] A "spread" position is a hedged position composed of two substantially offsetting option positions, or "legs". In the Merit markets, one leg consisted of a purchased and sold put option, and the other leg consisted of a purchased and sold call option. *525 [3] When a change in the interest rates occurs, the value of one leg changes inversely to the other, but not necessarily by the same amount. On November 13, 1980, $ 150,000 was transferred into petitioner's Merit T-Bill option account. *526 On November 20, 1980, FTI purchased a spread for petitioner's account, consisting of a purchase and sale of put options at two strike prices [4] and a purchase and sale of call options at two strike prices, all with a January 5, 1981, expiration date. This spread was identified in the stipulated Merit T-Bill database as trade No. 73. On December 5, 1980, FTI purchased a second spread on behalf of petitioner, consisting of a purchase and sale of put options at two strike prices and a purchase and sale of call options at two strike prices, all with a January 5, 1981, expiration date. This spread was identified in the stipulated Merit T-Bill database as trade No. 80. On December 26, 1980, FTI executed a "switch" transaction in trade No. 73, disposing of and replacing all of petitioner's original put positions and a portion of his original call positions. As a result of the switch transaction, petitioner reported losses *527 in 1980. After the transaction, petitioner still held positions in options at six strike prices as part of trade No. 73. All of the remaining positions in trade No. 73 and all of the positions from trade No. 80 were closed in 1981 on the expiration dates. In 1981, petitioner recognized gains from disposal of the trade No. 73 positions and recognized both gains and losses from disposal of the trade No. 80 positions. In all, the trades resulted in a net loss of $ 12,865 in petitioner's account for 1980 and 1981. In Seykota v. Commissioner, supra, we disallowed the taxpayers' losses and deductions in connection with the Merit T-Bill options trades because we found the trades to be factual shams. We noted that Merit operated a closed market, set options premiums, controlled the investors' accounts, and executed many trades before margin payments were received. Id. In addition, the trades followed distinct patterns that do not exist in valid markets, none of the options ever resulted in delivery of the underlying securities, and all investors bought spreads and generally "switched" positions (closed the loss leg and substituted a similar *528 position) at yearend. Id. Switches have the effect of postponing gains into the next year. Id.
We also held the trades to be economic shams, finding that from an objective standpoint the trades were not likely to produce economic benefits aside from tax benefits. Id. We also noted that the promoter touted the tax benefits of the program, and that the investors deliberately incurred first year losses to be followed by countervailing subsequent year gains. Id.
After the opinions in Seykota were issued, respondent engaged in efforts to settle deficiency disputes with the more than 100 FTI/Merit investors who did not take part in the test cases. Petitioner was among the investors with whom respondent entered into settlement discussions.
The Claimed Agreement
In October 1991, David L. Click, an attorney with the Internal Revenue Service, Office of Chief Counsel, was assigned to work on the Merit Securities project for the purpose of settling all outstanding cases consistent with this Court's opinions in Seykota. A number of investors, including petitioner, recognized spread gain legs in closed years subsequent to the tax year before the Court. In *529 the course of settling cases, Mr. Click initiated discussions with investors to determine whether gains recognized in years subsequent to those in which losses were disallowed should be considered in determining the taxpayer's deficiency in the open, loss years. Respondent had taken the position that recognized gains in the closed taxable years could be used to discount the disallowed loss deductions by offsetting them against related losses in the open year, provided that the taxpayer could verify the closed year gains by submitting copies of subsequent year returns and any amended returns. The subsequent year return would allow respondent to determine whether there was a gain leg in that year, whether the gain was related to the disallowed loss in the previous year, the nature of the gain (capital or ordinary), and whether there were other losses in the subsequent year that needed to be adjusted to determine a true picture of the taxpayer's spread transactions. Sometime in the spring of 1992, Mr. Click and counsel for petitioner, Irwin S. Meyer, engaged in discussions concerning discounting petitioner's 1981 gains, but petitioner did not submit a copy of the 1981 returns and *530 no further meaningful communication took place until the fall of that year. [5] In a letter to Mr. Meyer dated October 19, 1992, Mr. Click enclosed decision documents and tax computations reflecting a full disallowance of the claimed Merit losses, which resulted in a deficiency in petitioner's 1980 Federal income tax in the amount of $ 119,043 plus additions to tax. The first paragraph of the letter states, "If you agree with this decision, please sign the original and one copy and return them to me in the enclosed, self-addressed envelope." The second paragraph of the letter states the following: The Service's records indicate that the 1981 (Mr. Lamborn's gain year) year is closed. Please forward a copy of the original 1981 tax return and an amended return reflecting the reversal of the gain. We will discount any refund into the open 1980 year. In the event a discount is necessary, please do not sign the enclosed decision document.
*531 In response to the October 19, 1992, letter, Mr. Meyer telephoned Mr. Click on November 6, 1992, to propose that the 1981 gains attributable to the disallowed 1980 losses be netted directly against the 1980 losses in determining petitioner's 1980 tax liability. Mr. Click rejected Mr. Meyer's proposal and indicated that acceptable methods for "netting" the gains and losses were to either (1) discount any calculated 1981 overpayment back to 1980 and net that against the 1980 deficiency or (2) allow the 1980 deficiency, in its entirety, to bear interest until April 15, 1982, before netting it against any 1981 overpayment for purposes of further interest calculations. [6] Mr. Click indicated that discounting the 1981 overpayment back to 1980 was the preferable method. *532 Mr. Meyer then suggested that, because of the excessive burden involved in determining which 1981 gains were related to the 1980 losses, the parties apply a formula using the ratio that the 1980 and 1981 losses bore to the 1981 gains. [7] Mr. Click stated that such an approach sounded reasonable but that he would have to review the calculations before he could approve the concept. At the end of October 1992, responsibility for administering FTI/Merit project cases on behalf of the Office of Chief Counsel was transferred to Wilton A. Baker. Thereafter, petitioner enclosed copies of his amended Federal income tax returns for 1980 and 1981 with a letter dated December 16, 1992 from Allen W. Lazaroff, petitioner's accountant, to Mr. Baker. The 1981 amended return reflects capital gain income *533 reduced by $ 207,064 from the original 1981 return, resulting from the elimination of the 1981 gains related to the 1980 losses. In total, the amended return reflects a refund of $ 64,985 for 1981, which when discounted back to 1980, based on prevailing interest rates, amounts to $ 58,023. Mr. Lazaroff's calculations then applied that amount to reduce the 1980 deficiency to $ 5,515. The letter closed by stating the following: The enclosed documents should provide sufficient information to verify our computations and we, therefore, ask that you prepare stipulation and decision documents on that basis. Should you have any further questions regarding this matter, please do not hesitate to contact us.
Almost one year later, on December 9, 1993, Mr. Baker sent to Mr. Meyer a proposed decision document, along with supporting computations, which reflects a deficiency in petitioner's 1980 Federal income tax in the amount of $ 53,797 plus additions to tax. The reduction from the deficiency indicated in the October 19, 1992, letter was due primarily to a capital loss carryover from 1977, which respondent verified from the documents enclosed with the December 16, 1992, letter *534 sent by petitioner. Unlike petitioner, however, respondent did not carry any refund due for 1981 back to 1980 because, according to respondent's calculations, the net effect of reversing the 1981 Merit T-Bill options gains and losses resulted in a deficiency for 1981, not an overpayment. Respondent's calculations differ from petitioner's in that respondent reversed the tax effect of trade No. 80, which was closed entirely in 1981, as well as trade No. 73, which was closed in 1980 and 1981, whereas petitioner only reversed the tax effects of trade No. 73. Subsequent discussions proved fruitless, with respondent insisting that the tax effects of trade No. 80 be reversed, and petitioner arguing that respondent's position was contrary to the offer set forth by Mr. Click on October 19, 1992, and November 6, 1992, and to other settlements reached with other investors. On May 2, 1994, petitioner filed the instant motion. Discussion
Petitioner contends that the October 19, 1992, letter and November 6, 1992, telephone conversation constituted a settlement offer made by respondent to petitioner, and petitioner accepted the offer in the December 16, 1992, letter. According to petitioner, *535 the terms of the agreement are the following: 1. The deficiency due for 1980 is $ 53,797 before the application of the refund due for 1981. 2. Petitioner is subject to an addition to tax under section 6653(a)(1) with respect to additional taxes owed. 3. Petitioner is subject to an addition to tax under section 6651(a)(1) because petitioner's 1980 Federal income tax return was filed 15 months after the due date. 4. Petitioner is subject to additional interest under section 6621(c). [8]
The *536 general agreement outlined by petitioner seems to comport with the positions taken by both parties, but it does not describe a method for calculating the 1981 gains to be eliminated. Therein lies the problem. The different methods of calculating the 1981 tax liability, when carried back to 1980, result in widely varying deficiencies for 1980 -- $ 5,515 according to petitioner's calculations and $ 53,797 according to respondent's calculations. The issue for us to decide is whether the parties agreed on a method to calculate the 1981 tax liability. It is not necessary that the parties execute a closing agreement under section 7121 in order to settle a case pending before this Court, but, rather, a settlement agreement may be reached through offer and acceptance made by letter, or even in the absence of a writing. Haiduk v. Commissioner, T.C. Memo. 1990-506; Tompkins v. Commissioner, T.C. Memo. 1989-363; Himmelwright v. Commissioner, T.C. Memo. 1988-114. Determination of whether a settlement agreement has been reached is governed by general principles of contract law. Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436 (1969), *537 supplemented by 53 T.C. 275 (1969); Haiduk v. Commissioner, supra; Quinones v. Commissioner, T.C. Memo. 1988-269. An objective manifestation of mutual assent to essential terms is a prerequisite to the formation of a contract. Heil v. Commissioner, T.C. Memo. 1994-417; 17A Am. Jur. 2d, Contracts, secs. 27 and 28 (1991); 1 Williston on Contracts, sec. 3:5 (4th Ed. 1990). Mutual assent generally requires an offer and an acceptance. 17A Am. Jur. 2d, Contracts, sec. 41 (1991). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement, Contracts 2d, sec. 24 (1981). The offeror is "the master of the offer", meaning that the offeror determines the manner in which the offeree may accept the offer. Farnsworth, Contracts, sec. 3.12 (2d ed. 1990). On October 19, 1992, respondent made an offer to petitioner to settle the case. The offer did not reverse petitioner's 1981 gains from trading in the Merit T-Bill program, *538 and invited petitioner to accept by signing and returning the enclosed settlement documents. Petitioner did not accept this offer. The second paragraph of the October 19, 1992, letter advised petitioner to refrain from signing the settlement documents, if he did not agree with the amounts, and forward a copy of the original 1981 Federal income tax return and a 1981 amended return reflecting the manner by which petitioner proposed the gain be reversed. The basis of the claimed offer is the statement in the letter that respondent "will discount any refund into the open 1980 year", taken in conjunction with respondent's previous position that the 1981 gains related to the disallowed 1980 losses may be reversed. Petitioner claims to have accepted the offer by enclosing the 1981 returns with the December 16, 1992, letter. Although the claimed offer contains no calculations, petitioner suggests that such general offers have resulted in agreements that have been upheld in other cases. We do not agree with petitioner. Mr. Click, in the October 19, 1992, letter, intended to bind respondent only according to the specific terms stated in the enclosed settlement agreement. The statement *539 in the second paragraph that respondent "will discount any refund", unlike the first paragraph, does not specifically set forth a deficiency amount or additions to tax, nor does it suggest a precise method of calculation of "discounting any refund." As such, the statement, alone, is too vague and incomplete to be considered an offer. It does not suggest that petitioner had the ability to close the deal. [9] Rather, the statement suggests the terms of a possible future bargain, expressing only that respondent would consider any counteroffer by petitioner. See 1 Williston on Contracts, sec. 3:5 (4th ed. 1990). The statement also differs from the undisputed offers involved in the three cases relied upon by petitioner. In two of those cases, although no numbers were agreed upon, respondent made offers which indicated that the taxpayer had the ability to close the deal according to specific terms. See, e.g., Haiduk v Commissioner, T.C. Memo. 1990-506 *540 (the Commissioner made by letter an offer to settle the case, specifically outlining the time and manner by which the taxpayer could accept, and the taxpayer timely complied with the requirements of the offer); Treaty Pines Investment Partnership v. Commissioner, 967 F.2d 206, 211 (5th Cir. 1992) (the Commissioner unsuccessfully claimed that the agreement was not consummated because taxpayer's "acceptance" of the offer was invalidated by the taxpayer's subsequent failure to execute the proper forms to settle the case). The third case concerns an attempt by the Commissioner to be relieved of a settlement agreement based upon her unilateral miscalculation. Stamm International Corp. v. Commissioner, 90 T.C. 315, 320 (1988). The statement contained in the second paragraph of the October 19, 1992, letter did not evidence that petitioner could close the deal by acceptance. Furthermore, the statement left open the possibility for widely divergent deficiency calculations. Petitioner also claims that statements made by Mr. Click during the November 6, 1992, telephone conversation, in conjunction with the letter, constitute *541 respondent's offer -- the letter stating that respondent would give effect to the 1981 gains and the telephone conversation discussing the method by which those gains would be calculated. In so arguing, petitioner ignores the fact that, during the telephone conversation, Mr. Meyer made the suggestions as to calculating the 1981 gains. We believe the telephone conversation only supports our conclusion that Mr. Click did not intend to bind respondent. Mr. Meyer made the proposal during the telephone conversation and, thus, became the offeror, leaving it to Mr. Click to accept, and he did not. In fact, in response to a suggestion as to the manner by which to determine the 1981 gains that were attributable to the 1980 losses, Mr. Click stated, according to Mr. Meyer, that "such an approach sounded reasonable but he would have to review the calculations [of the 1981 gains to be reversed according to the proposed ratio] before he could approve the concept" (emphasis added). Stating merely that an approach sounds reasonable, under these circumstances, does not constitute an acceptance of an offer. Add to that Mr. Click's statement that he could not approve the concept before reviewing *542 it, and it could not be clearer that Mr. Click did not intend to bind respondent. It is important to emphasize that Mr. Click withheld consent as to the "concept" of petitioner's proposal. Petitioner argues that Mr. Click's entertainment of the proposal suggests that Mr. Click was prepared to enter into an agreement that only discounted the 1981 gains that were related to the 1981 losses. This may or may not have been the case, but Mr. Click at no time expressed the intent to bind respondent. Mr. Baker's position of reversing not only the 1981 gains related to the 1980 losses but also the 1981 gains and losses from trade No. 80 may differ from positions that might have been adopted by Mr. Click, or by other Office of Chief Counsel attorneys in this case, or from the terms of other FTI/Merit settlements, but that is not relevant in determining whether the parties reached an agreement in this case. The only issue that concerns us is whether Mr. Click bound respondent to an agreement, and we find that he did not. Accordingly, petitioner's motion is denied. An order will be issued denying petitioner's motion.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. To be consistent with our opinion in Seykota v. Commissioner, T.C. Memo. 1991-234, supplemented by T.C. Memo. 1991-541, we describe the offsetting positions as "spreads". These positions, however, also come within the definition of the term "straddle" as that term is used in the Internal Revenue Code. See Katz v. Commissioner, 90 T.C. 1130, 1135 n.12 (1988); Perlin v. Commissioner, 86 T.C. 388, 390↩ n.8 (1986).
3. Each leg of the spread had identical expiration dates, and each dealt with identical T-Bills. In each spread, the T-Bills had identical principal amounts and identical maturity dates. Seykota v. Commissioner, supra↩.
4. The "strike" price is the price at which the T-Bill would be sold upon exercise of the option.↩
5. Respondent had made two previous offers by letters dated June 5, 1991, and Dec. 23, 1991, to settle the case in accordance with the Seykota v. Commissioner, supra↩, opinions. These offers were not accepted and are not at issue in petitioner's motion.
6. In Mr. Meyer's affidavit, submitted with petitioner's motion, Mr. Meyer does not state that Mr. Click proposed any method for determining the 1981 gains that respondent would eliminate in calculating any overpayment in 1981 to net against the deficiency in 1980.↩
7. Mr. Meyer was not aware of the existence of, and he and Mr. Click did not discuss, a detailed and agreed upon analysis of the Merit transactions that reflected which 1981 gains were attributable to the 1980 loss transactions.↩
8. The notice of deficiency does not contain a determination of additional interest under sec. 6621(c). In his reply to respondent's objection to the instant motion, petitioner stated that respondent has not asserted additional interest under sec. 6621(c) in any pleadings and that sec. 6621(c) is not a part of the case. Petitioner concedes, however, that the settlement agreement that he seeks to enforce contains a provision concerning liability under sec. 6621(c) to which he is subject should the agreement be enforced.↩
9. Petitioner seemed unsure of whether additional interest under sec. 6621(c) was included in the offer.↩