BRUCE F. AND JUDY E. JOHNSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Johnson v. Commissioner
Docket Nos. 546-83, 34606-83, 2502-84
United States Tax Court
T.C. Memo 1992-369; 1992 Tax Ct. Memo LEXIS 393; 63 T.C.M. (CCH) 3197; June 29, 1992, Filed *393 Decision will be entered under Rule 155. Robert H. Aland and L.G. Harter III, for petitioners. Alan M. Jacobson, for respondent. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned for trial to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b) (4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Bruce F. and Judy E. Johnson
Year
Deficiency
1978
$ 2,489,508
1980
1,125,841
Tommy K. and Betty L. Crouch
Year
Deficiency
1977
$ 3,108,241
1978
105,478
1980
522,606
Steven G. and Jill H. Newcom
Year
Deficiency
1978
$  601,370
1980
531,881
*394 After concessions by respondent and by petitioners Johnson and Crouch, the primary issue for decision is whether certain commodity futures straddle transactions allegedly conducted for petitioners on the London Metal Exchange produced losses which are deductible for Federal income tax purposes. In the event that petitioners' straddles are found to produce deductible losses, we must decide whether the related gains are long or short term. Second, in the event that petitioners' straddle transactions are found to have no Federal income tax effect, we must decide whether petitioners are required to include in income in their first taxable years before this Court gains realized from the closing of straddles initiated in the immediately preceding taxable years, which are not before the Court. An additional, preliminary matter relates to the admissibility of the report prepared by respondent's expert witness, Michael Cameron. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners Johnson resided in Indian Head Park, Illinois, when they filed their petition. Petitioners *395 Newcom resided in Naperville, Illinois, when they filed their petition. Petitioners Crouch resided in Georgetown, Kentucky, when they filed their petition. [3]
Bruce F. Johnson, Tommy K. Crouch, and Steven G. Newcom are professional commodities traders who have had a longstanding and close relationship, both business and personal. Inasmuch as only petitioner husbands engaged in commodities transactions, hereafter only the husbands will be referred to as petitioners. Crouch and Newcom, who were both raised on farms, have been friends since childhood. Crouch obtained his start in the commodities business at an early age, buying hogs for Heinold Commodities, Inc. He became a commodities broker in 1971, and in 1973 he hired Newcom and formed a partnership with him. Johnson, *396 whose formal training is in the law, became a commodities broker in 1970. He bought stock in Packers Trading Co. (PTC), an agricultural commodities brokerage business, in 1970 and is currently president of PTC. In 1977, Crouch and Newcom also bought stock in PTC, which petitioners now control. Currently, Crouch runs the PTC branch office in Lexington, Kentucky. Petitioners are members of the Chicago Mercantile Exchange, a membership which gives trading privileges on the International Monetary Market and Index and Option Market. Petitioners are substantial traders on the Chicago Mercantile Exchange and characteristically maintain large open positions in agricultural and other commodities, including gold, silver, copper, foreign currencies, and Treasury bonds and bills, as well as engaging in commodities straddles. During the years in question, Johnson speculated heavily in cattle futures contracts and other agricultural commodities in the United States. Crouch was a large-scale speculator in hog contracts in the United States, and Newcom, trading on a somewhat smaller scale, also maintained large open positions in cattle and hog futures as well as other commodities in the United *397 States. Petitioners have a number of other business interests in common, e.g., owning real estate, horse breeding, and syndicating race horses. Petitioners share the same financial adviser, Jerry D. Sparks, an attorney and CPA who handles all of their personal financial affairs. He advised them in their transactions on the London commodities market; all London commodities transaction statements were forwarded to him for evaluation. George Segal, one of petitioners' fellow commodities brokers, who had his own commodities firm and who was a member of the Chicago Mercantile Exchange, first introduced petitioners to trading in London. He recommended that they trade with Competex, S.A., a Swiss broker/dealer with a London office, whose manager was James Gourlay. Between 1976 and 1979, petitioners allegedly engaged in commodities straddles in silver and base metals and certain other commodities on the London Metal Exchange (LME), trading through Competex, a non-ring-dealing firm headquartered in Geneva, which transacted its London metals trades through Ingleram Ltd., owned by James Gourlay. In mid-1979, petitioners ceased dealing with Competex and, through the efforts of Sparks, *398 transferred their trading to London & Atlantic Market Brokers Ltd. (LAMB), a non-ring-dealing commodities broker/dealer located in London, whose principal was David Lamb. The circumstances of trading on the London Metal Exchange, as well as the strategy of trading in commodities straddles, has been described in detail, with extensive definition of terms, in our opinion in Glass v. Commissioner, 87 T.C. 1087, 1107-1117 (1986), which is cited in full infra p. 16. Petitioners' transactions with both Competex and LAMB consisted of straddles in silver and base metals, and to a lesser extent other commodities, similar in form to those described in Glass v. Commissioner, supra. The only trade which was distinguished from those in Glass was that, in December 1980, petitioner Crouch purchased and took actual delivery of 10,388 troy ounces of silver from LAMB (the spot purchase), selling it back to LAMB in February 1981, at a loss of # 13,427.64. Petitioners gave broad discretion to Competex to trade for them. They did not place their trades personally. Rose Papich, an employee of Segal, dealt with Competex in Geneva. Petitioners settled *399 upon what they termed the "parameters" of their trading; i.e., the desired expiration dates of the futures contracts and the magnitude of the losses they desired. Their policy was to trade primarily in metals, whose price movements were more predictable than those of soft commodities. Papich communicated these parameters to the Competex office in Geneva, which relayed instructions to London. Competex was given discretion to establish straddle positions, to close out the gain and loss legs of the straddles, and to establish new positions in order to achieve the desired results. Petitioners' legal and financial arrangements with Competex were lacking in formalities. Only Crouch signed an agreement with Competex. Petitioners wrote checks for alleged margin amounts and gave them to Segal, who to the best of their knowledge forwarded them to Competex. Neither margin arrangements nor commissions were formalized in writing. Petitioners received confirmation statements from Competex, but did not sign and return the returnable portion of the statements. Although the net value of petitioners' accounts was frequently negative by significant amounts of money, they never were subject *400 to margin calls. Nor were petitioners ever required to make payments on prompt dates when losses were realized. Petitioners never submitted their financial statements to Competex, nor did they investigate the financial soundness of Competex beyond their acceptance of Segal's recommendation. The following are the amounts transferred by petitioners to Competex: Payor
Date
Amount
Johnson
12/15/76
$  12,000
11/1/77
18,500
11/10/78
40,000
$  70,500
Crouch
9/26/76
$  52,500
10/27/77
67,500
12/15/78
30,000
$ 150,000
Newcom
12/16/76
$  5,250
10/28/77
7,500
11/9/78
10,000
$  22,750
After petitioners ceased doing business with Competex, each received a retransfer of cash, which in effect reduced the cost of the transactions, as follows: Johnson
Total transfers
$ 70,500
Retransfer
17,500
Net cost
$ 53,000
Crouch
Total transfers
$ 150,000
Retransfer
7,500
Net cost
$ 142,500
Newcom
Total transfers
$ 22,750
Retransfer
9,433
Net cost
$ 13,317
These are the only transfers of funds between petitioners and Competex and vice versa. In 1979, Paul Martin, one of the principals of Competex, died, and petitioners learned *401 that the company was in financial difficulties and about to be liquidated. Rose Papich became ill and was no longer able to function as petitioners' contact with Competex. Petitioners instructed their adviser Sparks to find another broker to handle their London business. Sparks made a trip to London in July 1979 to investigate commodities brokers and returned with the recommendation that petitioners deal with David Lamb of LAMB. Lamb made a trip to Chicago in September 1979 to meet petitioners and discuss the matters of trading strategies and commissions. Lamb made several subsequent trips to visit petitioners, one during the "Hunt crisis" in the silver market, which lasted from December 1979 through May 1980, when silver prices rose to unprecedented heights. Petitioners also traveled to London in August 1981 and observed LAMB's operations. Petitioners' financial arrangements with LAMB were similar to those with Competex. Petitioners established the parameters of their dealing, which were communicated to LAMB by Sparks, who had a role analogous to that of Rose Papich in dealing with Competex. Petitioners never made an order for a specific trade, but gave complete discretion *402 to LAMB to establish positions and leg in and out, to achieve the desired results. Petitioners' legal relationship with LAMB was as lacking in formality as their relationship with Competex. Petitioners signed partially filled-out agreements with LAMB, in which the standard language provided for an interest charge on debit balances. No interest was ever charged. All petitioners engaged in trades with LAMB dated November 1, 1979, yet petitioners Johnson, Crouch, and Newcom did not sign agreements or checks until November 27, 23, and 8, respectively. Margin and commission agreements were not formalized in writing. No payments were made at prompt dates, and no margin calls were enforced, despite petitioners' negative balances. Confirmation statements were received by petitioners, but none of these contracts was signed and returned by them. Petitioners paid the following amounts to LAMB: Payor
Date
Amount
Johnson
11/27/79
$  25,000
6/30/80
75,000
7/29/81
15,000
12/29/81
5,000
3/05/82
5,000
$ 125,000
Crouch
11/23/79
$ 50,000
12/12/79
20,000
6/30/80
75,000
12/29/81
5,000
3/05/82
5,000
$ 155,000
Newcom
11/08/79
$ 10,000
6/30/80
40,000
12/29/81
5,000
3/05/82
5,000
$ 60,000
*403 These were the only sums which passed between petitioners and LAMB. David Lamb, an accountant as well as a commodities dealer, at one time had a business relationship with James Gourlay of Competex. In 1971, Gourlay formed Ingleram Investments, which placed Competex's trades in London and handled the data processing for Competex. David Lamb worked out of the Ingleram offices and provided accounting services for Competex in exchange for the use of Ingleram's facilities. Lamb left Ingleram in 1978 and founded LAMB, a non-ring-trading commodities brokerage house. David Lamb offset his trades with petitioners with Jeremy Oates, Ltd. (Oates), another non-ring-trading London commodities broker. The degree of offsetting was confined, however, to simultaneous purchases and sales, in which neither LAMB nor Oates bore any risk. These trades served to establish a market price and were part of a mechanism established to avoid the imposition of the British value added tax on petitioners' trades. For these trades, Oates charged LAMB 10 pence per transaction. Petitioners discontinued their London straddle activity in 1982 because the Internal Revenue Code had been amended by the Economic *404 Recovery Tax Act of 1981, Pub. L. 97-34, secs. 501-509, 95 Stat. 172, 323-335, so as to remove the apparent advantages of such trading. OPINION Respondent determined that petitioners' trades were shams, primarily in the sense that no transactions ever took place and, in the alternative, in the sense that the transactions lacked economic substance; i.e., that the only function of petitioners' LME straddles was to incur losses in the first trading year in order to obtain the tax advantages of postponing tax on ordinary income and obtaining the favorable rate on capital gains in subsequent years. Hence respondent's position is that neither the losses nor the gains from petitioners' LME activity should be recognized for income tax purposes. Petitioners argue that their straddle transactions on the LME are identical in substance and strategy to their commodities trading in the United States. Since respondent has conceded the issue of recognition of the gains and losses of petitioners' trading in the United States, petitioners argue that the gains and losses from their London trading, which was part and parcel with their United States trading, should be recognized as well. Petitioners' *405 position is that Congress provided a per se rule for the deductibility of the straddle losses of dealers and that, consequently, their LME straddle trading should be accorded its tax effect in full. Respondent's determinations in the notice of deficiency are presumed correct. Petitioners have the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Admissibility of Respondent's Expert Report
As a preliminary matter, we consider the admissibility of the report prepared by respondent's expert witness. Petitioners object to the introduction into evidence of Michael Cameron's report on the ground that it contains hearsay and is not the opinion of a disinterested expert. At trial, we reserved ruling on its admissibility. We hold that the report is admissible. Cameron clearly qualifies as an expert by virtue of a career of 17 years in the commodities business. He has presented in his report a detailed analysis of the data on which he based his conclusions. Hence his report satisfies the criteria for admissibility of an expert report articulated in Mid-State Fertilizer Co. v. Exchange National Bank of Chicago, 877 F.2d 1333, 1339-1340 (7th Cir. 1989), *406 holding that a report which presents only conclusory statements without facts, evidence of the inferential process, and hypotheses considered is without value. In Laureys v. Commissioner, 92 T.C. 101, 129 (1989), this Court held that an economist's evaluation of options transactions was "an overzealous effort * * * to infuse a talismanic precision" into the subject of speculation in stock options, citing Messing v. Commissioner, 48 T.C. 502, 512 (1967). Cameron's report, on the other hand, presented in detail the data upon which he based his conclusions in such a way that the reader is able to make his own evaluation of its conclusions. Cameron's report indeed contained some hearsay statements on the subject of persons involved in trading commodities on the LME. These are not received into evidence to establish the truth of the assertions therein, but for the purpose of establishing Cameron's qualifications. More precisely, it was necessary for Cameron to assert not only his knowledge of the commodities business, but also his probity, as he admittedly was involved at one time in tax-motivated transactions on the LME, though he only subsequently *407 discovered their sham character. We find that the somewhat argumentative tone of the report goes more to its weight than to its admissibility. The Transactions Were Not Bona Fide
On the basis of the evidence presented, we find that petitioners' LME straddle activity consisted of factual sham transactions. In the case of the trading with LAMB, the spuriousness of the transactions is clear. The transactions with Competex were certainly an economic sham and most likely a factual sham as well. Petitioners testified repeatedly that their trading with Competex and LAMB was identical, and hence we conclude that their dealings with both trading partners were equally lacking in substance. Petitioners' London trading partners produced a paper trial which in itself might have been sufficient for us to find that some type of transactions, albeit lacking in economic substance, took place. Petitioners appear to have entered into principal-to-principal contracts with Competex and LAMB. These contracts appear to be enforceable. Upon closer scrutiny, this appearance of solidity, "the baseless fabric of this vision" dissolves; "this insubstantial pageant" [4] melts into thin air. In *408 practice the parties' behavior indicated lack of substance. All signs point to the conclusion that there was no risk on either side of the Atlantic: no intention of demanding payment of alleged debts by either side and no concern about potential loss on either side. We emphasize that petitioners' dealings with Competex and LAMB did not take the form of dealings between customer and broker as they would in the United States. To say that the LME was a principal-to-principal exchange means that Competex and LAMB acted as petitioners' trading partners in every alleged transaction. Competex and LAMB, who were given complete discretion over petitioners' accounts, were, in addition, adverse to petitioners on every trade. As a result of this factually and ethically ambiguous situation, this Court has recognized a distinction, in determining whether trading is bona fide, between transactions on a regulated domestic exchange, see Perlin v. Commissioner, 86 T.C. 388 (1986), *409 and transactions on an unregulated exchange such as the LME. See Glass v. Commissioner, 87 T.C. at 1158, 1106. Petitioners followed the trading paradigm of the Glass case, and their LME activity was marked by an extraordinary number of factors indicating sham transactions: lack of business formalities, coincidence of losses with tax needs, tax-motivated trading patterns, zeroing-out of balances with Competex, failure to reimburse negative balances with LAMB, payment for losses, lack of payment of margins and commissions, irregularities in documentation, failure to show laying-off of trades, and improbabilities in sizes and dates of positions. In a nutshell, the failure to repay negative balances, in conjunction with the large debts incurred, and the disregard of margins, prompt dates, and commissions, leads us to conclude that "real money" was not involved in these transactions. We find that these transactions fall within the definition of a sham in substance: "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). *410 Section 165(a) allows deductions for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Deductions, in the case of an individual taxpayer, are limited, inter alia, to "losses incurred in a trade or business" and "losses incurred in any transaction entered into for profit, though not connected with a trade or business". Sec. 165(c). The regulations provide: "To be allowable as a deduction * * *, a loss must be evidenced by closed and completed transactions * * *. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Sec. 1.165-1(b), Income Tax Regs.; see Gregory v. Helvering, 293 U.S. 465 (1935). Petitioners base their case in part on the per se rule of deductibility of straddle losses provided in section 108(b) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 630, as amended by sec. 1808(d), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818. DEFRA section 108(a) and (b) as amended reads as follows: (a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or *411 more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. (b) Loss Incurred in a Trade or Business. -- For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. DEFRA section 108 as amended does not apply, however, to sham transactions. Glass v. Commissioner, 87 T.C. 1087, 1164-1173 (1986), affd. sub nom. Bohrer v. Commissioner, 945 F.2d 344 (10th Cir. 1991), affd. sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir. 1989), affd. sub nom. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), *412 affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988). See Lee v. Commissioner, supra at 917 ("The [London option] transactions * * * lacked economic substance. As such, they are outside the purview of * * * [section] 108".); Friedman v. Commissioner, supra at 791; Keane v. Commissioner, supra at 1092-1093; Kirchman v. Commissioner, supra at 1494; Demartino v. Commissioner, 862 F.2d 400, 404-407 (2d Cir. 1988), affg. T.C. Memo. 1986-263; Enrici v. Commissioner, 813 F.2d 293, 295 n.1 (9th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985); *413 Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. Forseth v. Commissioner, supra; Katz v. Commissioner, 90 T.C. 1130, 1137 (1988). DEFRA section 108(f) as amended, 100 Stat. 2818, defines a "commodities dealer" as an individual described in section 1402(i)(2)(B). Under section 1402(i)(2)(B), a commodities dealer is any person who is (a) actively engaged in trading section 1256 contracts, and (b) registered with a domestic board of trade designated as a contract market by the Commodities Futures Trading Commission. The parties have agreed that petitioners, who have for many years earned their living in trading commodities, qualify as United States commodities dealers within the statutory definition. This premise, however, does not entail the assumption that petitioners were dealers on any foreign exchange or that their London trades took place in the ordinary course of their trade or business as commodities dealers in the United States. In order to establish the validity of their LME activity, petitioners must show that genuine commodities trades took place and, in addition, must distinguish their *414 activity from the transactions treated in Cook v. Commissioner, 90 T.C. 975 (1988), affd. 931 F.2d 59 (9th Cir. 1991); Heltzer v. Commissioner, T.C. Memo. 1991-404; Fox v. Commissioner, T.C. Memo. 1988-570, affd. sub nom. Lerman v. Commissioner, 939 F.2d 44 (3d Cir. 1991). In the Cook case we considered the question of whether the benefit of the per se rule of DEFRA section 108(b) as amended allows commodities dealers to deduct losses from Glass-type transactions which lack economic substance. We held that it does not. In Lerman v. Commissioner, supra at 54-55, the Third Circuit concurred with our rationale for this decision, rejecting the suggestion that "because of a backlog in the court system, Congress abandoned the economic substance requirement as to straddle transactions involving dealers, along with some 40 years of jurisprudence regarding the economic substance doctrine, and instead gave these sham transactions post-facto blessing." In the Cook case, 90 T.C. at 979, the taxpayers stipulated that their straddle activity was *415 identical to that discussed in the Glass case, and consequently lacked economic substance. See Glass v. Commissioner, 87 T.C. 1087 (1986), affd. sub nom. Bohrer v. Commissioner, 945 F.2d 344 (10th Cir. 1991), affd. sub nom. TLee v. Commissioner, supra, affd. sub nom. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Keane v. Commissioner, supra, affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, supra, affd. sub nom. Friedman v. Commissioner, supra, affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Harrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988). It goes without saying that a transaction which is fictitious, designed merely to generate a paper trail to justify tax deductions, cannot *416 have economic effect. Where this Court has found factual sham transactions, we have based our findings upon analysis of some of the same factors we relied on when we found economic sham. For cases involving factual sham transactions, see Burrill v. Commissioner, 93 T.C. 643 (1989); Katz v. Commissioner, supra; Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S.    , 111 S. Ct. 2631 (1991); Price v. Commissioner, 88 T.C. 860 (1987), affd. without published opinion (10th Cir., Oct. 26, 1990); Forseth v. Commissioner, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. Enrici v. Commissioner, supra, affd. without published opinion sub nom. Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987), affd. sub nom. Mahoney v. Commissioner, supra, affd. without published opinion sub nom. Wooldridge v. Commissioner, 800 F.2d 266 (llth Cir. 1986); Brown v. Commissioner, 85 T.C. 968 (1985), *417 affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988); Julien v. Commissioner, 82 T.C. 492 (1984); Maring v. Commissioner, T.C. Memo. 1988-469; DeMartino v. Commissioner, supra; Ostrower v. Commissioner, T.C. Memo. 1984-496. Petitioners consequently seek to distinguish their LME activity from that analyzed in Glass v. Commissioner, supra. Petitioners' trades, unlike the transactions in Forseth v. Commissioner, supra, were at market prices. Petitioners' trades, unlike those in Julien v. Commissioner, supra, and Heltzer v. Commissioner, supra, were fully documented. Indeed, petitioners' transactions produced a veritable tidal wave of paper. The mass of trade confirmations and statements of open and closed positions gives an air of legitimacy to petitioners" LME activity. The presence of voluminous documentation cannot confer legitimacy upon otherwise spurious and insubstantial activity, when the underlying economics indicate that the realities were other than they appeared *418 to be. Petitioners contend that, unlike the taxpayers in the Forseth, Brown, Freytag, and Julien cases, they were not recruited to trade on the LME by promotional materials stressing tax benefits. Here petitioners protest too much; in view of their obvious sophistication in commodities trading, this distinction carries no weight. In Glass v. Commissioner, supra, analysis of promotional materials helped the Court to ascertain the economic realities of the transactions, a determination which we are able to make on the basis of other evidence. Petitioners also argue that, unlike the taxpayers in Heltzer v. Commissioner, supra, and Ostrower v. Commissioner, supra, they have produced the two brokers with whom they dealt, James Gourlay and David Lamb. The fact that petitioners were able to produce them was less remarkable than the way in which their testimony was convincingly impeached. Evidence was introduced that Lamb was indicted in May 1985 and pleaded guilty in August 1989 to a crime involving false statements, specifically a mail and wire fraud scheme in which he agreed to manufacture documentation *419 of back-dated commodities losses. Gourlay's testimony concerning his business methods was impeached by a former employee, a "finder" of United States clients, who testified that when some of his clients' commodity trades with Competex proved unsatisfactory, Gourlay produced new ones after the fact. We found both of these London brokers to lack credibility and have not included the bulk of their testimony in our findings of fact. Similarly, a letter written by petitioner Crouch to respondent on October 23, 1978, in the course of his first tax audit in the years before us has undermined our confidence in his veracity. In response to respondent's request for information concerning his commodities trading on the LME he wrote: I have never had a managed account. Every account carried in my name has always been subject to my complete control and direction. I have had direct input into all decisions on every transaction, and all trades were the result of my research and judgment to minimize my losses and to maximize my gains, a standard rule of all professional commodity traders. Every trade in any account carried in my name was my decision.* * * We believe this to be an accurate *420 description of petitioner Crouch's United States trading, but not his LME straddle activity. Similarly, we find much of petitioner's testimony at trial to be self-serving and contradicted by the facts contained in this record. Greater weight has been given to the objective facts than to petitioners' self-serving testimony. Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C.Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Finally, we emphasize again that in Glass v. Commissioner, supra, our conclusion was based upon one salient fact: the pattern of trading in which losses were intentionally incurred in year one, postponing any possible capital gain to year two or later years. It may have been possible for the taxpayers concerned to have made a profit in their LME activity, but the pattern of their trading showed that they chose not to. "Because the trades of Taxpayers follow the paradigm relied upon by the Glass court, the fact that Taxpayers here differ somewhat from * * * *421 others * * * is of no account." Kielmar v. Commissioner, 884 F.2d at 963. 1. Lack of Business Formalities
Between November 1 and 27, 1979, LAMB closed out contracts with petitioner Johnson generating losses of # 400,402 or $ 861,465. These transactions took place before receipt of Johnson's first check, written on November 27, 1979, in the amount of $ 25,000. Similarly, petitioner Crouch realized losses of # 879,450 or $ 1,898,308 in November 1979, before LAMB had received the first check in the amount of $ 50,000. It strains our credulity to believe that LAMB would have been willing to lose these amounts of money in trades with petitioners on the basis of petitioners' excellent reputation and the high degree of trust which characterizes the commodities business. These losses, generated in these two accounts in 1 month, exceed the total reported losses of the eight petitioners in the Forseth case. These losses were achieved before one penny's deposit was received. In Forseth v. Commissioner, 85 T.C. at 154, one of the factors which convinced this Court that the transactions were fictional was that trading began before the taxpayers *422 had posted any margin deposits. The lack of business formalities was also notable in petitioners' failure to create written contracts covering the various terms of their supposed agreements with Competex and LAMB: e.g., requirements of margins and commissions were not reduced to writing, and petitioners Johnson and Newcom never signed account agreements with Competex. The terms of the agreements with LAMB regarding interest on negative balances were not enforced. Petitioners did not sign the return portions of contract confirmations. In view of the volume of paper issued to petitioners by Competex and LAMB, it is all the more surprising that the essential terms of petitioners' agreements were not formalized. These details are not dispositive in themselves, but in combination with other indicators of phantom trades, they are suggestive of sham. 2. Coincidence of Losses With Tax Needs
In Forseth v. Commissioner, supra, we found that a remarkable correlation between tax needs and losses obtained was a strong indicator of factual sham. This factor was also cited in Glass v. Commissioner, 87 T.C. 1087 (1986), as an indication of *423 lack of economic substance, and has been cited in virtually every other case concerning LME straddles. The evidence of "losses to order" was a significant feature of petitioners' testimony at trial. Petitioners would wait until the end of the year to determine the amount of losses they needed and would then commmunicate their needs, through Papich or Sparks, to their trading partners abroad. Petitioners spoke of the "desired result"; i.e., the loss which they needed. When asked how he knew that the parameters transmitted through Papich were received, petitioner Newcom replied: "The results that I received were inside my parameters." Petitioners' characteristic way of describing the purpose of their trading was "to take the peaks and valleys out of [their] income." Crouch testified: "I gave them discretion to lift a loss leg if it reached a certain level, the level of loss that I needed to even out the peaks and valleys of my income * * * for tax purposes." As further evidence of the availability of "losses to order" stands respondent's Exhibit CA, which was obtained through British Inland Revenue's seizure of documents from LAMB. This document is a handwritten notation at the *424 upper left corner of the first page reading: "$ 1,500,000. 2 1/2%. 18 months. LT 1982". Petitioner Newcom's trades in 1980 also happen to have produced losses of $ 1,500.735. Lamb testified that this document was a "trade sheet" which indicated at the top the amount of the desired losses, the commission, and the desired prompt dates for the contracts. He testified that it was filled in simultaneously as trades were executed; it does not contain all of Newcom's trades, however. Regardless of how the document was prepared, it strikingly comfirms petitioners' own testimony that they communicated their tax needs to their trading partner in London and the necessary losses were produced. In sharp contrast with petitioners' LME activity, the results of their United States trading were highly unpredictable. Petitioner Newcom made $ 340,000 in trading outright positions in commodities futures in 1978 and lost approximately the same amount in 1979. In 1980, petitioner Johnson lost $ 8,000 in January, made $ 76,000 in February, lost $ 8,000 in March, made $ 118,000 in April, etc. This was the origin of the problem, the "peaks and valleys" in income, a problem which the LME activity *425 was designed to remedy. In view of the size of petitioners' positions and the number of years that they dealt on the LME, it can be no mere coincidence that petitioners did not make or lose any money beyond the payments which they made at the end of their periods of active trading. This lack of economic effect is substantial evidence that the results of their trading were prearranged to a supreme degree. 3. Tax-Motivated Trading Patterns
The timing of petitioners' trading was characteristic of tax motivation. Johnson, for instance, initiated his trading on December 15, 1976. Between that date and December 29, 1976, his Competex account generated short-term losses of $ 800,792. Crouch's trades began on October 11, 1976, and, through November 8, 1976, generated short-term losses of $ 3, 500,098. Newcom's trades, dated December 15, 16, and 23, generated short-term losses of $ 350,203. Trading in subsequent years yielded a similar pattern. Johnson's trading, for example, recommenced on June 14, 1977, and ended on September 28, 1977, generating additional net losses of $ 1,190,400. In 1978, his trades took place between June 5 and December 6 and generated an additional *426 $ 5,120,194 in losses as well as $ 5,682,531 in gains, for a net gain of $ 562,337. His positions were closed out between May 16 and July 24, 1979, giving rise to losses of $ 10,367,919 and gains of $ 11,898,190, for a net gain of $ 562,337. With the exception of 1979, the year in which all positions were closed out, Johnson traded intensely for limited periods near the end of the year, until his loss parameters were achieved. Petitioners did no trading with Competex in the first 3 months of any year. A compilation of their trading dates shows that the median date of their trades was October 11; i.e., the same number of trades took place before October 11 as after that date. In other words, petitioners did as much trading in the last 12 weeks of the year as in the prior 40 weeks. Petitioners switched their business to LAMB in November 1979 and traded heavily in November and December. They traded again in March through June of 1980, stopped for 17 months, and traded again for the period between December 1981 through April 1982. Petitioners' testimony was explicit concerning the tax considerations which dominated their pattern of trading. Johnson said: "We were doing tax-motivated *427 spreads or tax management spreads. Along those lines we tend to do more trading towards the end of the year, so they were most probably instructed not to be doing any trading at this point." The record is clear that the trading was exclusively tax motivated and that the mechanics of the trades under consideration were the same as the trades which were found to be economic shams in Glass v. Commissioner, supra. In that case we found that the one consistent thread which ran through all the consolidated cases was that "losses, either ordinary or capital, were intentionally incurred in year one, followed by countervailing gains in year two or in many instances later as a result of rollovers." Glass v. Commissioner, 87 T.C. at 1172. This factor, in and of itself, indicates simply that petitioners' trades amounted to the type of prearranged economic sham transactions described in the Glass case. Additional economic factors in this case point to the conclusion that nothing of substance happened beyond the generation of documentation of paper losses. 4. Zeroing Out of Account Balances With Competex
In Forseth v. Commissioner, 85 T.C. at 158, *428 we found that the zeroing out of accounts, whereby either the taxpayers' balances happened to be zero or small positive and negative balances were ignored, in a time of great volatility in the relevant markets, was suggestive of a factual sham transaction. A very similar set of facts occurs here. The following is a summary of petitioners' net realized gains and losses in their trading with Competex, as presented in the composite of petitioners' trades which forms part of the stipulation of facts: Petitioner
1976
1977
1978
1979
Net Gain
Johnson
($ 800,792)
($ 1,190,400)
$   562,337
$ 1,530,271
$ 101,416
Crouch
(3,500,098)
(  916,513)
3,238,923
1,650,827
473,139
Newcom
( 350,203)
(  146,971)
476,572
40,465
19,863
These figures are essentially similar to those on petitioners' tax returns and to the figures they presented in their brief, with the exception of petitioner Crouch's net loss in 1977, which his tax return indicates was a capital loss of $ 1,849,671, representing an additional unaccounted-for loss of $ 933,158. In this case, petitioner Crouch's net trading account with Competex produced, in dollars, a net loss of $ 460,019, rather than *429 a gain of $ 473,139. There is no explanation for this sizeable discrepancy or for Crouch's failure to repay his negative balance at the termination of his relationship with Competex if his trading activity, in fact, produced such large losses. Because of variations in the exchange rate, the net result, in pounds sterling, of petitioners' trading with Competex was that their accounts were negative: 1976
1977
1978
1979
Net
Johnson
(# 479,516)
(# 648,716)
# 366,125
# 754,946
(# 7,161)
Crouch
(2,121,272)
(413,421)
1,703,368
749,997
(81,328)
Newcom
(209,702)
(81,611)
263,269
19,014
(9,030)
Petitioners had made deposits, however, which had the effect of offsetting their negative balances. The following refunds were made: to Johnson on September 7, 1979, $ 17,500; to Crouch on August 29, 1979, $ 7,500; and to Newcom on October 12, 1979, $ 9,433. [5] When the refunds are subtracted from petitioners' total deposits, as converted to pounds sterling, they show that only petitioner Johnson had a significant positive balance. The account of petitioner Crouch was zeroed out -- assuming that his losses were as reflected in the exhibits and not as reported on *430 his tax returns -- and the account of petitioner Newcom appears to have been negative by approximately # 855. (The exchange rate varied greatly during the years in question. These variations may explain such a discrepancy.) Dollars
Pounds Sterling
Johnson
Total transfers
$ 70,500
# 38,287 Retransfer
17,500
7,781 Net cost
$ 53,000
# 30,506   Less: Negative balance
(7,161)
Balance remaining
# 23,345 Crouch
Total transfers
$ 150,000
# 84,840 Retransfer
7,500
3,324 Net cost
$ 142,500
# 81,516 Less: Negative balance
(81,328)
Balance remaining
#   188 Newcom
Total transfers
$ 22,750
# 12,548 Retransfer
9,433
4,373 Net cost
$ 13,317
# 8,175 Less: Negative balance
(9,030)
Balance remaining
($ 855)
The accounts of petitioners Crouch and Newcom were apparently zeroed out by means of the retransfers. Whether the sizeable unrefunded balance in petitioner Johnson's account -- over # 23,000 -- is due to imprecision in record keeping or to failure of Johnson to demand and Competex to repay is not clear. Either assumption undermines the appearance of reality of Johnson's entire course of dealing with Competex. *431 If zeroing out of account balances was characteristic of economic sham in Glass v. Commissioner, 87 T.C. 1087 (1986), failure to repay sizeable negative balances is a detail which undercuts all appearance of reality. 5. Failure to Repay Negative Balances to LAMB
According to the stipulation of facts, petitioners' net gains and losses in their trading with LAMB were as follows: Petitioner
1979
1980
1981
1982
Johnson
($ 1,501,924)
($ 2,473,938)
($ 387,055)
$ 3,414,429
Crouch
(3,801,968)
(1,144,075)
520,255 3,270,294
Newcom
(375,861)
(1,115,050)
(247,810)
1,360,869
*432 Petitioner
Net Gain/(Loss)
Johnson
($ 948,488)
Crouch
(1,155,494)
Newcom
(377,852)
In pounds sterling, the losses were as follows: Petitioner
1979
1980
1981
1982
Johnson
(# 690,260)
(# 1,091,730)
(# 204,555)
# 1,909,379
Crouch
(1,743,305)
(   486,051)
268,424 1,854,063
Newcom
(  173,013)
(   486,475)
( 128,766)
759,595
Petitioner
Net Gain/(Loss)
Johnson
( # 77,166)
Crouch
( 106,869)
Newcom
(  28,659)
Petitioner Crouch's figures in his 1982 Federal income tax return again differ from the stipulation of facts; Crouch reported a net gain of $ 2,243,613, an apparent underreporting of $ 1,026,681. If this figure is accurate, Crouch's account was zeroed out with LAMB. Our evaluation of the final value of his account is based upon the stipulation. Petitioner Johnson testified that he had a balance in his favor with LAMB, which was not refunded to him; this claim is belied by the fact that the losses he deducted on his tax returns significantly exceeded his gains, although the difference is greater in dollars than pounds because the exchange rate was less favorable in 1982, when the gains were realized. When petitioners' transfers *433 of funds to LAMB are subtracted from their losses, the results are as follows: Dollars
Pounds Sterling
Johnson
$    125,000 # 57,131 Negative balance
(    948,488)
(77,166)
Final balance
($ 823,488)
(# 20,035)
Crouch
$     155,000 # 69,723 Negative balance
(1,155,494)
(88,869)
Final balance
($ 1,000,494)
(# 19,146)
Newcom
$      60,000 # 27,090 Negative balance
(377,852)
(28,659)
Final balance
($ 317,852)
(# 1,569)
We see this failure to repay negative account balances not as one factor among many of equal importance, but as a salient factor in this case. Evidence was presented of LAMB's suits against its business associates to recover bad debts. If petitioners' debts to LAMB had been bona fide, we are persuaded that LAMB would have attempted to collect them. The failure to demand such substantial sums indicates that "All that glitters is not gold." [6] Petitioners' prior gains as well as their losses take on an air of unreality. If discrepancies are attributed to gaps in documentation, the same conclusion applies. Petitioners testified that Sparks kept careful account of the documents from their LME activity. Any rational investor *434 would have demanded documentation of losses of this magnitude if he had any intention of repaying them. 6. Alleged Margin Payments Were For Losses Generated
Petitioners repeatedly testified that their fees were capped at 2-2 1/2 percent of the loss leg of their straddles. We find that transfer of funds between petitioners and their London contacts can better be described as payment for losses. Looking first at the 1976-79 dealings with Competex, we notice the correlation between the alleged margin amounts and the losses which Competex generated for petitioners in the first 3 years of their relationship. In each case, the total short-term losses for the years 1976-78 bear a clear relationship to the fees paid. In effect, petitioners paid a fee of just under 1 percent for their losses. The relationship does not apply in 1979, the year in which petitioners' positions were closed out between the months of May and July. Losses for that year, in which all *435 positions were closed out and refunds were made to petitioners, are not included in the following table: Petitioner
1976
1977
1978
Johnson
Loss
$ 800,792
$ 2,001,764
$ 5,120,192
Fee
12,000
18,500
40,000
Refund
% of loss
1.5
.92
.78
Crouch
Loss
$ 3,500,098
$ 4,416,794
$ 7,337,726
Fee
52,500
67,500
30,000
Refund
% of loss
1.5
1.53
.41
Newcom
Loss
$ 350,202
$ 500,291
$ 590,674
Fee
5,250
7,500
10,000
Refund
% of loss
1.5
1.5
1.69
Petitioner
1979
Total
Johnson
Loss
--    $ 7,922,748
Fee
53,000
Refund
($ 17,500)
% of loss
.67
Crouch
Loss
--    $ 15,254.618
Fee
142,500
Refund
(   7,500)
% of loss
.93
Newcom
Loss
--
$  1,441,167
Fee
13,317
Refund
(   9,433)
% of loss
.84
Petitioners' payments to Competex in 1976 equaled precisely 1.5 percent of the value of their losses, and that relationship between payments and losses pertained for Crouch and Newcom in 1977 as well. While the rate paid by Newcom in 1978 significantly exceeded that paid by Johnson and Crouch, his proportionately larger refund brought *436 his rate of fees into line with that paid by the other two petitioners. While the rates paid by the three petitioners are not precisely equal, all can be rounded off to 1 percent of each petitioner's losses. This calculation is irrespective of gains reported in the years in question and excludes the 1979 losses resulting from the closing of all positions in that year; apparently no additional fees were charged for these losses. A similar relation between losses and amounts paid can be demonstrated in the trades with LAMB: Petitioner
1979
1980
1981
Johnson
Loss
$ 1,501,923
$ 4,001,495
$ 6,581,814
Fee
25,000
75,000
20,000
% of loss
1.66
1.87
.3
Crouch
Loss
$ 3,801,968
$ 5,001,192
$ 8,109,289
Fee
70,000
75,000
5,000
% of loss
1.84
1.5
.21
Newcom
Loss
$ 375,680
$ 1,500,735
$ 2,338,314
Fee
10,000
40,000
5,000
% of loss
2.66
2.67
.21
Petitioner
1982
Total
Johnson
Loss
--
$ 12,085,232
Fee
$ 5,000
125,000
% of loss
1.03
Crouch
Loss
--
$ 16,912,449
Fee
5,000
155,000
% of loss
.92
Newcom
Loss
--
$ 4,214,729
Fee
5,000
60,000
% of loss
1.42
Petitioners Johnson and Crouch again *437 appear to have paid fees equal to essentially 1 percent of their losses reported on their Federal tax returns in dollars. Newcom's rate was significantly higher, 1.42 percent. The fact that lesser fees were paid in 1981 than in prior years suggests that petitioners had overpaid and exceeded the target rate. As discussed below, petitioners made no additional payments on prompt dates or when their accounts were negative. The dates on which petitioners made their payments also indicate payment for losses rather than deposits to protect the broker from risk, as payments were made at or near the conclusion of trading periods, rather than at the beginning or when accounts were negative, as would be expected for margin payments. Looking beyond petitioners' initial activity in 1976, when initial payment was made and trading terminated in December, we find various periods of activity. Johnson traded in June 1977 and again in August and September of that year. He made an additional payment on November 1, 1977. Crouch traded in April and again in October through December. He made an additional payment on October 27, 1977. Newcom traded in June and again in September and October. He *438 made an additional payment on November 28, 1977. In 1978, Johnson traded in June and again in November and December, making payment on November 10, 1978. Crouch traded in July and August and again in November and December, paying on December 15, 1978. All three petitioners concluded their trading with Competex in June and July 1979. All received refunds later in the year. Newcom was refunded 41 percent of his total payment; this refund brought his rate of payment, in terms of losses generated, into line with the payments of petitioners Johnson and Crouch. Transfers of funds to LAMB produced a similar pattern of payment after periods of trading were completed. All petitioners made an initial payment when trading began in 1979. Petitioners' activity for the year 1980 ceased on June 30. All three petitioners wrote checks to LAMB on June 30, 1980, as in compensation for business completed. Petitioners said they engaged in no activity during the Hunt crisis due to the volatility of the market. (They were interested in a stable market in which prices and contangos were predictable.) This was the time when David Lamb traveled to Chicago allegedly to demand additional deposits *439 from petitioners. No additional deposits were made until December 29, 1981. Trading resumed heavily on December 15, 1981, for all petitioners. All petitioners wrote checks to LAMB on December 29, 1981. Petitioners closed out their positions with LAMB in March and April 1982, and all wrote checks of the same amount, $ 5,000, to LAMB on March 5, 1982, as if in payment for the closing out of the accounts. Petitioners' accounts were still collectively negative to the extent of approximately # 40,750. Their identical $ 5,000 payments did not extinguish their debts. 7. Lack of Margins and Commissions
a. Margins
Another indication that no real debts were created is that petitioners' accounts with Competex and LAMB were repeatedly negative to a substantial degree, but no additional margin calls resulted in additional payment. In January 1976, Newcom's net account with Competex was negative by more than $ 200,000, yet the only payment Newcom had made to Competex was $ 5,250. At the end of 1979, Johnson owed LAMB # 173,000, yet had made payments of only $ 10,000. In June 1980, Johnson owed LAMB more than # 599,000; at the end of 1980, # 659,000. No margin had been paid *440 since June 30, 1980. Lamb testified that the net worth of LAMB was negative in 1980, yet he collected no margin amounts from petitioners. Petitioners' expert, Nigel Lion, testified that he would not have traded with petitioners on this basis. The purpose of margin deposits is to protect the broker against loss. When asked if he had ever in his business encountered a situation in which customers' net realized forward losses exceeded unrealized gains plus margin deposits, Jeremy Oates responded that occurred "only in times of panic," e.g., the Hunt silver crisis; perhaps it had happened three to four times in his 22 years in business. Petitioners' testimony was that one of the reasons why no additional margin calls were made was that -- in addition to their excellent credit and the competition for business on the LME -- payments on account of losses on the LME were due only at the prompt date; i.e., the trade date on a futures contract. No payments were ever made on prompt dates. Seen in this context, Crouch's spot purchase of silver loses its appearance of substance. In addition to there being discrepancies in the paperwork for the transaction, there are economic problems as *441 well. Crouch purchased the silver from LAMB for # 73,027.64 on December 23, 1980, and sold it back to LAMB on February 10, 1981, for # 59,600; this transaction gave rise to a loss of # 13,427.64, plus deductible storage expenses. Crouch referred at trial to tax advantages to this transaction. There is no evidence that LAMB was ever compensated for this apparent loss. The last prior transfer of funds from Crouch to LAMB had been $ 75,000 on June 30, 1980, the end of the last month of petitioners' 1980 straddle trading with LAMB. This was during the period of the Hunt crisis, when petitioners did not close any of their LME positions. Trading resumed on December 15, 1981, and on December 29, 1981, Crouch transferred an additional $ 5,000 to LAMB, 10 months after the apparent loss on the spot silver, but near in time to the finalizing of the 1981 losses. Crouch's total payments to LAMB between February 10, 1991, the date of the alleged loss, and the date of closing his account were $ 10,000, less than the loss on the silver transaction alone. Crouch never repaid his # 19,146 negative balance with LAMB. b. Commissions
No coherent account was ever given by petitioners concerning *442 the London brokers' erratic practices in charging commissions. Petitioners testified that they negotiated commissions on highly favorable terms as a result of their dealer status and substantial net worth. Petitioners "sat down with David" and negotiated commissions capped at 2-2 1/2 percent of the value of the loss legs of the straddles. In 1976, Johnson was charged only one commission of # 3,616.34, at the exchange rate of # 1.67 per dollar, having a value of $ 5,930.80. In that year he realized and recognized losses of $ 800,792. In 1976, Crouch was charged two commissions totaling # 16,101.63, equivalent at the exchange rate of # 1.65 per dollar to $ 26,567.69. In the same year, Crouch realized and recognized losses of $ 3,500,098. Newcom was charged one commission of # 1,562.16 or $ 2,608.81. His losses for the same year were $ 350,202. Newcom again paid only two commissions in 1977, two in 1978, and one in 1979. This pattern suggests to us that no genuine trades were transacted between petitioners and Competex: Competex had arranged to be compensated through a method of fee payments rather than commissions based on trading activity. See Thurner v. Commissioner, T.C. Memo. 1990-529. *443 For all petitioners in 1976, the rate of commissions apparently charged fell between .74 and .76 percent; they never approached the 2-2 1/2 percent cap, despite the fact that petitioners repeatedly testified that commissions were capped at 2-2 1/2 percent of the loss leg of the straddle. The close correlation of commissions with losses should not be taken as an indication that commissions were actually charged, however. Petitioners' gains and losses reported on their tax returns were net of commissions. Only if all remaining balances in the accounts were fully paid at the end of the business relationship would there be a clear indication that the commissions represented actual charges actually paid. Petitioner Johnson testified that he did not receive a refund from LAMB of the balance in his favor, as he wanted to retain the ability to place further trades. The stipulation of facts shows that petitioner Johnson's account was negative to the extent of # 77,166. Petitioners gave only a vague account of their commission agreements, saying that they were negotiated separately. They had no explanation of the fact that commissions did not appear to be charged on a consistent basis. *444 Petitioner Newcom testified that commissions were to be deducted from margin deposits. When asked why there were more commissions charged in 1978 than in prior years, Johnson answered: "Well, maybe they didn't catch the cap in the year before. I really don't know. I mean, they charged them how they charged them, and it didn't bother me any. I felt like * * * I still had a good deal with them." The implication was: when manna falls, ask no questions. Petitioners' lack of concern with the way commissions were charged can also be explained if we assume that excess account balances were never intended to be withdrawn nor negative balances to be repaid. In other words, the alleged commissions appear to be window dressing. Commissions seem to have functioned primarily as an aid in manipulation of apparent profits and losses. See Brown v. Commissioner, 85 T.C. 968, 998-999 (1985). 8. Irregularities in Documentation, Size, and Dates of Contracts, and Lack of Evidence of Laying-Off of Trades
Various irregularities appear in the documentation of petitioners' transatlantic straddle trades. These have been analyzed in detail by respondent's expert Cameron, *445 who testified concerning customary practices in the trade or business of commodities brokers on the LME. Petitioners presented a great deal of testimony concerning the fact that principals are free to contract as they please on the LME: there is no requirement that commissions be charged, that margins -- or deposits as they are called in London -- be required, or that formal contracts be signed before trading commences or when trade confirmations are issued. The impression given was that anything goes in London. However, respondent's expert confirmed the testimony of fact witnesses on both sides in stressing that these details were unusual. The general picture of petitioners' LME activity is that too many details were unusual: the lack of formal agreements, interest charges, and margin deposits becomes the more remarkable as the size of losses increases. We note also the unusual size of petitioners' positions and the fact that they traded much further out than was common on the LME, making it implausible that other traders could be found who were sufficiently substantial and willing to take positions opposite them. Analysis of contract numbers of petitioners' trades with both *446 Competex and LAMB gives evidence of backdating; each contract is assigned a number, and, in general, the numbers run in ascending order. From time to time, however, a higher number is inserted in the sequence. This happened on the first day of Johnson's trading with Competex. David Lamb testified that these discrepancies could be explained by the fact that trades were sometimes processed out of order, as computer runs were done in batches. We are persuaded, however, that the occurrence of out-of-sequence trades is part of a larger problem of lack of a rational numbering system. Competex was said to have laid off its trades to reduce its risk of maintaining large open positions primarily by establishing equal and opposite positions with ring-dealing members of the LME. David Lamb testified that he used the method of marrying trades between customers, so that the risk in a contract with petitioners would be eliminated by his establishment of an equal and opposite position with another customer. No evidence of this practice was produced, however, despite the appearance of both Gourlay and Lamb as witnesses. Lamb showed petitioners documentation of trades he conducted with Oates, *447 as evidence of his laying-off of trades. Petitioners were not aware of the fact that every LAMB trade with Oates was "crossed", that is, each transaction was balanced by an exactly equal and opposite trade. On November 1, 1979, LAMB bought from Oates a contract to buy 593 tons of lead for delivery on August 1, 1980, and a contract to sell to Oates the same quantity at the same price. For each of these transactions, Oates charged LAMB 10 pence. When this fact was mentioned, Lamb, who had apparently forgotten this detail of their relationship, responded: "Nobody in their right mind would do anything based on a line! I could have put thousands of tons on one line." It is clear that these were paper transactions, done outside the ordinary course of Oates' business, designed to shelter petitioners' trades from the British value added tax. They did not represent a genuine shifting of LAMB's risk in its contracts with petitioners. No other evidence of the practice of laying-off was presented. Lamb's claim that he was laying off his trades with petitioners by establishing opposite positions with other clients is implausible in light of other evidence presented: that petitioners maintained *448 unusually large positions for the LME; that the prompt dates of their contracts were considerably further out than was normal on the LME; and that unusually large contracts appeared to be executed at one price. This Court has considered, as evidence of sham transactions, the factor of the size of the transactions and the lack of apparent ability of the dealers involved to deal in the amount of securities allegedly sold. Price v. Commissioner, 88 T.C. 860, 884 (1987), affd. without published opinion (10th Cir., Oct. 26, 1990). Petitioners' expert, Nigel Lion, observed that petitioners traded in unusually large lots for the LME. The volume of their business was not unusual for them, he subsequently decided, in view of the value of the positions which they typically maintained in the United States. The volume of petitioners' trades was not their only unusual characteristic, however, and it is the conjunction of many unusual circumstances which leads to the conclusion that the transactions were shams. Petitioners established extraordinarily large positions in the first 2 weeks of their trading with Competex, for example a contract for 2,800,000 ounces of silver *449 worth over $ 17 million having as yet made no deposit. Competex charged only occasional commissions, and no evidence was presented that Competex was in fact backing off petitioners' trades with other LME members. David Lamb testified that over 90 percent of his trades with petitioners were balanced by his taking the opposite position with other clients. No evidence of the existence of these other unusually large contracts was presented. Petitioners also typically traded much "further out" than most London traders. There was universal agreement among the witnesses that the majority of contracts on the LME are written for a period of 3 months or less. Prices for 18 to 24 month contracts are available, but not routinely so. In view of these facts, it is implausible that LAMB could have found partners willing to trade with petitioners in volume unusually large for the exchange in which they dealt. For instance, on May 12, 1980, Crouch closed a transaction in which he lost $ 15,855,840. The next day, he closed the opposite leg of the straddle, realizing in one transaction a gain of $ 16,656,789. (The numbers of this contract were out of chronological order.) If Lamb had clients *450 able to lose over $ 16.5 million dollars in one transaction, he produced no evidence of it. All three petitioners traded heavily in 1980, but, despite the fact that contracts with more than 3-month prompt dates were uncommon on the LME, had no opening transaction that did not have a prompt date in 1982. Respondent's Exhibit CA indicates, however, that petitioner Newcom's parameters included realization of gains in 18 months. Cameron's analysis of the contract numbers and dates of petitioners' trades indicates that in the first 2 weeks of petitioners' 1979 trading with LAMB, LAMB did not appear to be doing much other business. All but 300 of the consecutive contract numbers were assigned to petitioners. Again in early 1980, most of LAMB's numbers appear to be assigned to petitioners. During 1 week, only 26 numbers were used, 23 of them by petitioners. Again we find it beggars the imagination to believe that LAMB was internally marrying petitioners' trades with trades of other clients willing to take opposing positions. This is especially true in view of the fact that LAMB dealt with few other customers at that time. Notable also is the fact that petitioners' trades, as in *451 the previous example, were executed in unusually large quantities but all at one price. On May 13, 1980, Crouch bought 1,800,000 ounces of silver in one lot at one price paying no commission, with a resultant gain of $ 16,536,382. In Katz v. Commissioner, 90 T.C. 1130, 1135 (1988), we held that the thinness of the market and the absence of split fills were evidence of lack of economic substance. (A split fill is a multicontract purchase or sale executed in segments of the total purchase or sale quantity, at different times, and often at different prices.) Between April 23 and May 9, 1980, the value of petitioner Crouch's average closed contract was $ 1,370,289. These facts suggest a pattern more consistent with sham than actual transactions. On the basis of all the facts in the record, we are convinced that petitioners' LME straddle activity was a factual sham. Testimony was presented that the trade confirmation statements received by petitioners represented binding contracts. But it is apparent that the terms of the contracts were not enforced and were never meant to be enforced. Petitioners agreed to pay LAMB interest on negative balances, but never paid *452 any interest. LAMB failed to collect negative balances, and petitioner Johnson failed to collect his positive balance of approximately # 23,345. Two $ 1 million discrepancies in petitioner Crouch's favor between the stipulated gains and losses and his tax returns also add to the impression that play money rather than real money was involved. The obvious complete absence of concern for risk on the part of petitioners and their supposed trading partners and the failure to collect margin deposits when accounts were negative or when prompt dates came, point inexorably to the conclusion that the transactions in question involved no real risk. When creditors fail to collect what appear to be debts, we conclude that those debts are unreal. As a result, we hold that the transactions between petitioners and Competex and LAMB were a factual sham and not bona fide transactions. To the question of whether there was any basic difference between their transactions with Competex and LAMB, petitioners responded that they were the same. Even if the transactions took place, the evidence is incontrovertible that they were indistinguishable from the Glass transactions and hence lacking in *453 economic effect. Consequently, it is not necessary for us to reach the issue of the characterization of petitioners' straddle-generated gains. Duty of Consistency
Petitioners' dealings with Competex began in 1976, when they deducted their initial losses from LME straddle activity. In the years in controversy, they recognized gains attributable to closing the positions opposite those closed in the earlier years. Petitioners argue that, if their LME activity is found to have no economic effect, this conclusion applies to these gains as well: petitioners should not be required to recognize these gains, as they were the product of sham transactions. Respondent's position is that, even if the transactions are shams, petitioners are estopped from using this holding as a defense to the recognition of income from prior year straddles: the duty of consistency forbids taxpayers from obtaining a benefit in a year which is closed by the statute of limitations and later changing their position to the detriment of the Commissioner. On this issue, we hold for respondent. It is well established that taxpayers have a duty of consistency regarding positions taken on their tax returns. *454 When a taxpayer has received a benefit in a prior, closed year, he may not change his position so as to receive a second benefit, even though the position in the later year may be erroneous. Unvert v. Commissioner, 72 T.C. 807 (1979), affd. 656 F.2d 483 (9th Cir. 1981). The duty of consistency applies when: (1) The taxpayer has made a representation or reported an item for tax purposes in one year, (2) the Commissioner has acquiesced in or relied on that fact for that year, and (3) the taxpayer desires to change the representation previously made in a later year after the statute of limitations on assessments bars adjustments for the initial tax year. Unvert v. Commissioner, supra at 815. The duty of consistency represents the inverse of the tax benefit rule, which states that recovery, in a later year, of a deducted item is not required if the item did not give rise to a tax benefit. Sec. 111(a). It is undenied that petitioners did receive tax benefits in prior years from straddle-generated losses. They may not now avoid recognition of related income. In Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), *455 affg. Glass v. Commissioner, 87 T.C. 1087 (1986), the duty of consistency was applied to Glass-type straddle transactions which had been found to be without economic substance. There, although the London straddle transactions engaged in by the taxpayers were shams, the Tax Court was entitled to find that the taxpayers recognized gain on the closing of straddles which had yielded deductions in prior years. Id. at 758. The requirements for applying the duty of consistency have been met in this case. Petitioners filed returns for tax years 1976 and 1977, claiming losses from straddles. By claiming these losses, petitioners represented that the transactions had economic substance. The Commissioner relied on these representations by accepting petitioners' returns as filed and allowing the statute of limitations to run. Finally, petitioners now argue, contrary to their previous position, that the transactions were shams and should not be recognized for Federal tax purposes. The Court of Appeals for the Seventh Circuit, to which an appeal for two petitioners would lie in this case, has similarly held that the duty of consistency applies to estop taxpayers *456 from disavowing an earlier position that gave rise to loss deductions generated by straddle transactions. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Tommy K. and Betty L. Crouch, docket No. 34606-83, and Steven G. and Jill H. Newcom, docket No. 2502-84.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. According to the stipulation of facts, petitioners Crouch resided in Illinois when they filed their petition. At trial, however, evidence was presented that by the time of the filing of their petition, they had moved to Georgetown, Kentucky.↩
4. Shakespeare, "The Tempest" IV, i, 51, 55.↩
5. The exchange rates on those dates were 2.2490, 2.2560, and 2.1570, respectively, according to the Wall Street Journal, which publishes the rate for the previous day used by banks trading in amounts of $ 1 million and more. Other conversions from pounds to dollars have been based upon the rates provided on the most closely following day for which a rate was used by Competex or LAMB in the trades composite forming part of the stipulation of facts. Hence, currency conversions are close approximations, but not exact.↩
6. Shakespeare, "The Merchant of Venice" II, vii, 66.↩